UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JOHN JONES,

                      Plaintiff,

        -against-                     <u>MEMORANDUM & ORDER</u>
                                         15-CV-0111(JS)(ARL)
COUNTY OF SUFFOLK and PARENTS
FOR MEGANS LAW,

                      Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:      Christopher T. Dunn, Esq.
                    Erin B. Harrist, Esq.
                    N.Y. Civil Liberties Union
                    125 Broad Street, 17th Floor
                    New York, NY 10004

                    Jennifer Spirn, Esq.
                    Lawrence F. Spirn, Esq.
                    Spirn & Spirn
                    150 Motor Parkway, Suite 401
                    Hauppauge, NY 11788

For Defendants:
County of Suffolk   Marlene Lange Budd, Esq.
                    Rudolph Max Baptiste, Esq.
                    Suffolk County Attorney's Office
                    H. Lee Dennison Building, 5th Floor
                    100 Veterans Memorial Highway
                    P.O. Box 6100
                    Hauppauge, NY 11788
Parents for
Megan's Law         Michael Anthony Miranda, Esq.
                    Richard B. Epstein, Esq.
                    Miranda Sambursky Slone
                      Sklarin Verveniotis LLP
                    240 Mineola Blvd.
                    Mineola, NY 11501

SEYBERT, District Judge:

Plaintiff John Jones[1] ("Jones") commenced this action on January 9, 2015 against Defendants the County of Suffolk ("the County") and Parents for Megan's Law ("PFML," and together with the County "Defendants"). Jones principally claims that (1) Defendants violated his Fourth and Fourteenth Amendment constitutional rights; and (2) the County's Community Protection Act, Local Law 10-2013, violates the New York State Constitution and should be deemed preempted by New York State's Sex Offender Registry Act. Pending before the Court are Defendants' motions to dismiss. (Docket Entries 25, 36). For the reasons that follow, Defendants' motions are GRANTED IN PART and DENIED IN PART.

<u>BACKGROUND</u>[2]

Jones was convicted of rape and sodomy in 1992. (Ahearn Aff., Docket Entry 36-5, ¶ 5.) After serving time in prison, Jones was released on parole in the late 1990s. He was never convicted of a subsequent offense. Jones now lives in Suffolk County with his family and maintains a steady job. (Compl. ¶¶ 10-11.)

Because of his conviction, Jones is required to register as a sex offender and adhere to the reporting procedures of the

---

[1] On May 4, 2015, Jones was granted permission to proceed with this case using a pseudonym. (May 4, 2015 Order, Docket Entry 38.)

[2] The following facts are drawn from Plaintiff's Complaint and are presumed to be true for the purposes of this Memorandum and Order.

New York Sex Offender Registry Act ("SORA"). (Compl. ¶¶ 10, 13.) People convicted of crimes covered by SORA undergo an individualized risk evaluation and assigned a risk assessment score. (Compl. ¶ 14.) Those who pose the lowest risk of reoffending are assigned a "Level One" designation; those who pose a moderate risk of reoffending are assigned a "Level Two" designation; and those determined to pose a high risk of reoffending are assigned a "Level Three" designation. (Compl. ¶ 14.) SORA risk levels are used to determine the amount of information that is collected from and made publicly available about people subject to the registry. (Compl. ¶ 15.)

Although Jones was assigned a Level One risk level--the lowest possible level--he is nevertheless subject to numerous SORA reporting requirements, including the obligation to (1) fill out and send an annual registration form to the New York State Division of Criminal Justice Services; (2) personally visit his local police department to have his photograph updated once every three years; and (3) notify law enforcement or the State of any changes to his address, educational enrollment, or "internet identifiers" within ten days of a change. (Compl. ¶¶ 20-21.)

On February 5, 2013, the Suffolk County legislature passed the Community Protection Act, Local Law 10-2013 (the "CPA"). (CPA, Docket Entry 36-3.) The CPA establishes an aggressive sex offender monitoring and verification program within the County.

(Compl. ¶ 23; CPA at 2-3.) More specifically, the CPA authorizes the Commissioner of the Suffolk County Police Department to enter into a three-year contract with PFML to provide "verification of residency reporting of all registered sex offenders who are not homeless and who are required to report pursuant to SORA" and "proactive monitoring of registered sex offenders to ensure accurate reporting." (CPA at 3, ¶¶ (i)-(ii).) According to the Complaint, PFML is a "victim's advocacy organization that campaigns for increased punitive regulation of people registered for past sex offenses" and "has called for legislative changes that, among other things, would require people convicted of SORA offenses to live far away from population centers." (Compl. ¶ 26.)

Pursuant to the CPA, Suffolk County Police Commissioner Edward Webber entered into a contract with PFML ("the Contract"), which runs from May 2013 to April 2016. (Compl. ¶ 28.) The Contract requires PFML to use ex-law enforcement personnel to "engage in proactive monitoring of registered sex offenders" and to "immediately notify the [Suffolk County Police Department] of any knowledge of a violation of law in Suffolk County." (Compl. ¶ 29 (alteration in original).) The Contract specifically describes these tasks as "law enforcement initiatives." (Compl. ¶ 29.) Under the Contract, PFML agents conduct verifications of all Level One registrants once a year, and all Level Two and Level Three registrants twice a year. (Compl. 31.) The PFML submits a

list of registrants scheduled for home verification visits in the upcoming week to the Suffolk County Police Department ("SCPD"). (Compl. ¶ 30.)  However, the SCPD reserves the right to alter, reject or suspend any scheduled verifications and may request that PFML conduct additional verifications.  PFML also submits regular reports to the SCPD about its home verifications.  (Compl. ¶ 30.)

In the summer of 2013, Jones received a letter from the SCPD announcing the SCPD's contract with PFML and explaining that Jones would be asked to provide personal identification and employment information to PFML.  (Compl. ¶ 33.)  The letter states in relevant part:

> Recently, the Suffolk County Police Department and Parents for Megan's Law entered into a contract for the purpose of conducting verifications of registered sex offenders residential and employment addresses. Registered sex offenders are **required** to provide this information under the New York State Sex Offender Registration Act, also known as Megan's Law (New York State Correction Law 6c).
>
> In the coming days and weeks, representatives of Parents for Megan's Law will be visiting all registrants within the Suffolk County Police District. The purpose of this visit will be to conduct in person residence verifications. The representatives from Parents for Megan's Law will display photographic identification which will identify them as a member of the Parents for Megan's Law Organization. You will be **asked** to provide them with personal identification of a verifiable source, (e.g. a NY State Driver's License or NY State Identification Card) or

other accepted forms of documentation that provides current address information.

In addition you may be **requested** to provide your employment information to the representative. If such a request is made, you will be asked to provide documentation (e.g. work identification card) to the representative for verification purposes. If proper documentation is presented this process should take only several minutes to complete.

(Miranda Decl. Ex. C., Docket Entry 36-4 (emphasis added).) The letter is from a Suffolk County Police Detective Lieutenant, the Commanding Officer of the Special Victim's Section.

Ten days after receiving the letter, PFML agents knocked on Jones' door. (Compl. ¶¶ 37-38.) Jones' youngest son answered the door and quickly informed his mother that "two police officers were at their house insisting that they speak with his father." (Compl. ¶ 39.) When Jones' wife--Jane Jones--came to the door, she asked the agents to identify themselves. (Compl. ¶ 40.) One of the agents said they were from PFML. (Compl. ¶ 40.) Jane Jones informed the agents that Jones could not come to the door because he was in the shower. (Compl. ¶ 41.) The agents remained on the front porch for approximately fifteen minutes waiting for Jones. (Compl. ¶ 43.) When Jones arrived on his porch, the agents questioned him about the addresses that he reports to New York State under SORA and the car he drives. (Compl. ¶ 44.) The agents also demanded Jones' driver's license, which was located in Jones' car. (Compl. ¶¶ 46-47.) According to Jones, the agents "followed

closely behind [him] as he walked down the front walkway to the street where his car was parked," and "stood within two feet" of him as he retrieved his license. (Compl. ¶ 47.) Jones then handed the agents his license and they kept it "for several minutes." (Compl. ¶ 47.) The agents also asked Jones multiple questions about his employment, although as a low-level registrant, Jones is not required to report his employment information to the State under SORA. (Compl. ¶¶ 48-49.) Before leaving, the agents told Jones that "they may make subsequent, unannounced appearances at his job to conduct additional investigations." (Compl. ¶ 50.)

Two PFML agents returned to Jones' home in July 2014, but they were informed by Jones' mother that he was not home. (Compl. ¶ 54.) A week later, three PFML agents returned. (Compl. ¶ 55.) According to the Complaint, one agent knocked on the door, a second stood in the driveway, and a third remained seated in the car with the car door open. (Compl. ¶ 56.) The agents again questioned Jones and demanded to see his driver's license. (Compl. ¶ 57.) Jones responded to the agent's questions and walked to his truck to retrieve his license, followed by one of the agents. (Compl. ¶¶ 57-58.) The agent retained Jones' license while he took notes. (Compl. ¶ 58.)

Jones claims that he has been damaged as a result of PFML's visits to his home. More specifically, Jones claims that he and his family live in fear that their friends or neighbors

will be present the next time PFML representatives visit them. (Compl. ¶ 60.) In addition, Jones claims that, as a result of PFML's actions, he has become less active in the community and in his children's activities. (Compl. ¶ 60.)

Both the County and PFML have move to dismiss the Complaint. Defendants both argue that PFML is not a state actor, and that Jones did not suffer any constitutional violations. (County's Br., Docket Entry 25-5, at 5, 12-17; PFML's Br., Docket Entry 36-6, at 6, 11-17.) In addition, the County argues that (1) Jones has failed to allege municipal liability, and (2) the Court should decline supplemental jurisdiction over Jones' preemption claim. (County's Br. at 6.) PFML also asserts that Jones' claims for injunctive and declaratory relief are either moot, or alternatively, that Jones lacks standing to assert them. (PFML Br. at 22.)

DISCUSSION

The Court will first address the legal standard before turning to Defendants' motions.

## Standard of Review

In deciding Rule 12(b)(6) motions to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 173 L. Ed. 2d 868 (2009); accord Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing Bell Atl. Corp. v.

8

*Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *First*, although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949; *accord Harris*, 572 F.3d at 72. *Second*, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*; *accord Harris*, 572 F.3d at 72.

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998). This has been interpreted broadly to include any document attached to the Complaint, any statements or documents incorporated in the Complaint by reference, any document on which the Complaint heavily relies, and anything of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

I.    PFML is a State Actor

        Both Defendants argue that Jones' claims brought
pursuant to 42 U.S.C. § 1983 must be dismissed because PFML is not
a state actor.  (See PFML's Br. at 6; County's Br. at 5.)  The
Court disagrees.

        Section 1983 provides individuals with "a method for
vindicating federal rights," including those rights conferred by
the United States Constitution.  Baker v. McCollan, 443 U.S. 137,
144 n.3, 99 S. Ct. 2689, 2694, 61 L. Ed. 2d 433 (1979).  To state
a claim under Section 1983, a plaintiff must plead that the
defendant deprived him of a federal or constitutional right while
acting under color of state law.  Cox v. Warwick Valley Cent. Sch.
Dist., 654 F.3d 267, 272 (2d Cir. 2011).  The "state action"
requirement exists "[b]ecause the United States Constitution
regulates only the Government, not private parties."  Flagg v.
Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 186 (2d Cir. 2005)
(internal quotation marks and citation omitted).  Thus, "only [ ]
those who 'carry a badge of authority of a State and represent it
in some capacity,'" can be held liable for constitutional
violations pursuant to Section 1983.  Storck v. Suffolk Cty. Dep't
of Soc. Servs., 62 F. Supp. 2d 927, 939 (E.D.N.Y. 1999) (quoting
Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191,
109 S. Ct. 454, 455, 102 L. Ed. 2d 469 (1988)).

It has been established that "a private entity does not become a state actor for purposes of § 1983 merely on the basis of "the private entity's creation, funding, licensing, or regulation by the government."' <u>Fabrikant v. French</u>, 691 F.3d 193, 207 (2d Cir. 2012) (quoting <u>Cranley v. Nat'l Life Ins. Co. of Vt.</u>, 318 F.3d 105, 112 (2d Cir. 2003). Rather, "[f]or the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." <u>Cranley</u>, 318 F.3d at 111 (internal quotation marks and citations omitted). Although there is no one standard for determining whether an entity is a state actor, several tests have emerged. Specifically, courts have found a private party's actions to be attributable to the state when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

<u>Sybalski v. Indep. Grp. Home Living Program, Inc.</u>, 546 F.3d 255, 257 (2d Cir. 2008) (quoting <u>Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n</u>, 531 U.S. 288, 296, 121 S. Ct. 924, 930, 148 L.

Ed. 2d 807 (2001)).  "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state."  Fabrikant, 691 F.3d at 207 (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S. Ct. 2764, 2770, 73 L. Ed. 2d 418 (1982)).  This inquiry is fact specific and begins with an examination of the conduct at issue.  See Brentwood, 531 U.S. at 295, 121 S. Ct. at 930.  Here, Jones claims that PFML, acting in concert with the SCPD, violated his Fourth Amendment rights when they visited his home unannounced, questioned him about his address and employment, and demanded his driver's license. Jones argues that PFML should be classified as a state actor under the "joint action" or "close nexus" test because its actions here are intertwined with those of the government.  (Pl.'s Opp. Br., Docket Entry 39, at 12.)

The "close nexus" test asks whether "[t]he State has so far insinuated itself into a position of interdependence with [the organization] that it must be recognized as a joint participant in the challenged activity."  Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S. Ct. 856, 862, 6 L. Ed. 2d 45 (1961).  The decisive factor is the degree of control that the government exercises over the private party's activities.  Grogan v. Blooming Grove Volunteer Ambulance Corps., 768 F.3d 259, 269 (2d Cir. 2014). The Court agrees that PFML was a state actor for purposes of the challenged conduct, both because PFML's monitoring operations were

directed by the SCPD, and because PFML was expressly delegated a public function through the passage of the CPA.

Although the mere existence of a contract between the state and a private entity does not create state action, additional factual allegations that the state "insinuated itself" into the management of the organization are sufficient to confer state actor status at the pleading stage.  See Forbes v. N.Y. City, 2008 WL 3539936, at *8 (S.D.N.Y. Aug. 12, 2008).  In Gitter v. Target Corp., 2015 WL 5710454, at *4. (S.D.N.Y Sept. 29, 2015), for example, the plaintiff sued Target for constitutional violations after she was handcuffed by a uniformed NYPD officer who was working a paid security detail at a Target store pursuant to a contract between Target and the NYPD.  The Court held that Target was not a state actor because the City of New York and the NYPD played no role in "managing or controlling Target's security policies."  Id.  Rather, the contract merely placed the officer within the store and he had discretion to monitor it as he saw fit.  Id.  Similarly, in Forbes v. New York City, the Court found that Lincoln Center was not a state actor based upon a license agreement allowing Lincoln Center to manage a park on New York City's behalf.  Forbes v. N.Y. City, 2008 WL 3539936, at *4 (2008).  That case involved a First Amendment challenge and the court found that Lincoln Center was not engaged in joint action with the City

because there was no evidence that the City had a hand in managing the park or chilling speech within it.  Id.

This case stands apart from the conduct in Gitter and Forbes because the County retained the power to actively manage the home verification program.  The SCPD proscribed the number of visits each registrant was scheduled to receive, and PFML was required to submit a schedule of its in home verifications to the SCPD, which the SCPD could then modify.  Further, the SCPD created the appearance of joint action with PFML by sending a letter to registrants indicating that they would be required to provide personal identification and employment information to PFML.  Because the SCPD retained control over the home verification program and worked jointly with PFML, Jones has sufficiently alleged that the state "insinuated itself" into the management of the PFML.

In addition, Jones sufficiently alleges that the County delegated to PFML the inherently public function of monitoring registered sex offenders.  See Fabrikant, 691 F.3d at 210 (holding that an animal rescue organization was a state actor when it spayed and neutered dogs; by "operating under the delegated animal-control authority provided by New York's Agriculture and Markets Law," it was "perform[ing] an exclusively public function that [was] delegated to it by the [S]tate."); cf. Kia P. v. McIntyre, 235 F.3d 749, 756 (2d Cir. 2000) (indicating that a private

hospital can become a state actor in its role "as part of the reporting and enforcement machinery . . . [of the] government agency charged with detection and prevention of child abuse.") Here, the home monitoring program was described in the contract as a "law enforcement initiative" and required PFML to use ex-law enforcement personnel to perform the work. Moreover, the Court need look no further than the regulatory regime codified by SORA to see that the monitoring of registered sex offenders is an inherently public function. PFML can therefore be found to be a state actor under either the "joint action" or "public function" test.

## II.   Jones Alleges Violations of his Fourth Amendment Rights

Having found that PFML is a state actor, the Court must next determine whether the Complaint alleges that PFML violated Jones' Fourth Amendment rights. Defendants both argue that PFML's action did not implicate the Fourth Amendment because Jones' interactions with PFML agents were voluntary and consensual. (County's Br. at 18; PFML Br. at 13-14.) Conversely, Jones claims that PFML unlawfully seized him--restricting his movement until the agents' "questions were answered and demands for documents satisfied." (Pl.'s Opp. Br. at 22.)

The Fourth Amendment protects an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

However, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred," which implicates a citizen's Fourth Amendment rights. Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968). A seizure takes place when a reasonable person would not "feel free to decline [a police] officers' requests or otherwise terminate the encounter.'" Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991). The proper inquiry necessitates a consideration of "all the circumstances surrounding the encounter." United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2111, 153 L. Ed. 2d 242 (2002) (quoting Bostick, 501 U.S. at 439, 111 S. Ct. at 2389). For example, in United States v. Drayton, the Supreme Court found that police officers who boarded a Greyhound bus and asked passengers questions about their travel plans and luggage did not "seize" the passengers because "there was nothing coercive or confrontational about the encounter." 536 U.S. 194, 203-04, 122 S. Ct. 2105, 2112, 153 L. Ed. 2d 242 (2002) (internal quotation marks and citation omitted). However, officers may "not induce cooperation by coercive means." Drayton, 536 U.S. at 201, 122 S. Ct. at 2110; see Philips v. Cty. of Orange, 894 F. Supp. 2d 345, 363 (S.D.N.Y. 2012) (holding that a child was seized within the meaning of the Fourth Amendment when she was taken to a room with three adults and "told she 'had to'

answer their questions"); United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) ("Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." (internal quotation marks and citations omitted)).

Here, both parties argue that the Supreme Court's recent holding in Florida v. Jardines supports their respective arguments. Florida v. Jardines, 133 S. Ct. 1409, 1416, 185 L. Ed. 2d 495 92-13). In Jardines, the court held that an illegal search occurred when the police used a drug-sniffing dog to "explore the area [surrounding] the home in the hopes of discovering incriminating evidence." Id. The court emphasized that the Fourth Amendment affords heightened protection to the home, and "the area immediately surrounding and associated with the home--what our cases call the curtilage." Id. at 1414 (internal quotation marks and citation omitted). While there is an implied license allowing police to knock on the front door of the home and "wait briefly to be received" in the hopes of securing an invitation to make further inquiries, the scope of the license is limited. Id. at 1415. Permission to "knock and talk" is justified on the ground that "it is no more than any private citizen might do." Id. at 1416 (internal quotation marks and citation omitted). The court in Jardines determined that by using the drug-sniffing dog to gather

evidence within the curtilage, the police exceeded the scope of their implied license and conducted an illegal search.

Defendants assert that because PFML agents' interactions with Jones can be classified as a "knock and talk," no Fourth Amendment violation occurred. However, the allegations in the Complaint raise questions about whether a reasonable person in Jones' position would feel free to terminate his interactions with PFML. The questioning here did not take place in an open field, or a Greyhound bus, but rather within Jones curtilage--an area afforded heightened Fourth Amendment protection. Moreover, in advance of the visits, Jones received a letter from the SCPD instructing him that he would be visited by PFML for the purpose of verifying his address and employment information. Although the letter stated that Jones would be "<u>asked</u> to provide them with personal identification" and "<u>requested</u> to provide employment information," the letter begins by stating that "registered sex offenders are <u>required</u> to provide this information under [SORA]." Citizens do not often receive letters from the police announcing home visits by third-party groups. At the very least, the letter is ambiguous as to whether compliance was mandatory. Finally, the description of PFML agents' conduct gives the distinct impression that compliance was not optional. The fact that the agents waited for fifteen minutes on Jones' porch while he was in the shower, "followed [him] closely" as he walked to retrieve his driver's

license, and told Jones that "they may make subsequent, unannounced appearances at his job," gives the encounter the appearance of a seizure of Jones' person, rather than a consensual "knock and talk." Defendants' motion to dismiss Jones' Fourth Amendment claim is therefore DENIED.

## III. Jones' Due Process Allegations are Duplicative of His Fourth Amendment Allegations

PFML seeks an order dismissing Jones' due process claim as duplicative of his Fourth Amendment claim. (PFML Br. at 17.) Jones asserts, in opposition, that his due process allegation is different than his Fourth Amendment claim because it is based upon the County's breach of the "non-delegation doctrine." (Pl.'s Opp. Br. at 34.) Specifically, Jones argues that his due process rights were infringed because the County's decision to delegate government power to PFML led to the violation of his liberty interest in familial association. (Pl.'s Opp. Br. at 34.)

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. CONST. Amend. XIV, § 1. Under the "non-delegation doctrine," the delegation of government authority to a private entity may violate an individual's right to due process if it interferes with a protected liberty or property interest. See Gen. Elec. Co. v. N.Y. State Dep't of Labor, 936 F.2d 1448, 1455 (2d Cir. 1991); Suss v. Am. Soc. for Prevention of Cruelty to

Animals, 823 F. Supp. 181, 188 (S.D.N.Y. 1993) ("For an interested party to make decisions utilizing governmental authority is anathema to due process."). Thus, to establish a violation of substantive due process, Plaintiffs must first identify a valid liberty or property interest. See Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 503 (2d Cir. 2001); Toussie v. Cty. of Suffolk, 806 F. Supp. 2d 558, 579 (E.D.N.Y. 2011). Jones claims in his opposition papers that his right to familial association was infringed by PFML's conduct. In support of his argument, Jones relies upon the Second Circuit's decision in Patel v. Searles, a case in which a detective gave the plaintiff's wife "false and defamatory information about him to make her fear for her own and her children's lives." Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002). Although the court explained in Patel that "this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association," id. at 137, subsequent decisions within this district have required the plaintiff to allege that a defendant engaged in conduct intended to interfere with family relations in order to make out a claim for infringement upon the right to familial association. See Kogut v. Cty. of Nassau, No. 06-CV-6695, 2009 WL 2413648, at *14-15 (E.D.N.Y. Aug. 3, 2009) (holding that the plaintiff's right to familial association was not infringed because the defendants did not direct any wrongful

conduct at the plaintiff's children); <u>Pizzuto v. Cty. of Nassau</u>, 240 F. Supp. 2d 203, 213 (E.D.N.Y. 2002) (dismissing Plaintiff's due process claim because there was "no evidence that the Defendants . . . took acts that purposely and directly affected Plaintiff's relationship"); <u>Busch v. N.Y. City</u>, No. 00-CV-5211, 2003 WL 22171896, at *4-5 (E.D.N.Y. Sept. 11, 2003) (finding that in order for the right to familial association to be implicated there must be an "obvious attempt to interfere with the familial relationship"). Jones' allegations in this case fall short of the purposeful conduct needed to assert a claim for infringement upon his familial relations. Jones claims that because of PFML's visits, he no longer takes an active role in his children's extracurricular activities and does not attend parent-teacher conferences. (Pl.'s Opp. Br. at 38.) Although Jones familial relationships may have been damaged as a result of PFML's visits, he has not alleged that Defendants infringed upon his right to familial association. Jones therefore cannot point to the invasion of a liberty interest that is separate and apart from the illegal seizure of his person in support of his due process claim. <u>See George v. CSX Transp., Inc.</u>, No. 13-CV-2317, 2014 WL 298275, at *4-5 (E.D.N.Y. Jan. 28, 2014) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must

be the guide for analyzing these claims.") (quoting <u>Albright v.</u>
<u>Oliver</u> 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114
(1994)).  Thus, Plaintiff's due process claim is DISMISSED.

IV.  <u>Monell Liability</u>

The County argues that it should be dismissed from this
action because Jones did not allege that he was injured by a
municipal policy or custom.  (County's Br. at 7.)  The Court
disagrees.  To state claim against a municipality pursuant § 1983,
a plaintiff must plead that alleged unconstitutional acts are
attributable to a municipal policy or custom.  <u>Monell v. Dep't of</u>
<u>Social Services of City of N.Y.</u>, 436 U.S. 658, 690, 98 S. Ct. 2018,
2035–36, 56 L. Ed. 2d 611 (1978).  The Complaint must therefore
identify "a formal policy which is officially endorsed by the
municipality" or "actions taken or decisions made by government
officials responsible for establishing municipal policies which
caused the alleged violation of the plaintiff's civil rights."
<u>Moray v. City of Yonkers</u>, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)
(citations omitted).  Jones' allegations meet this burden.  Jones
claims that his Fourth Amendment rights were violated because of
a home verification program that was conceived by the Suffolk
County legislature and supervised by the SCPD.

V.  <u>The Court Need Not Decide Whether Jones' Request for</u>
<u>Injunctive Relief is Moot</u>

Finally, PFML moves to dismiss Plaintiff's claim for declaratory and injunctive relief, arguing that Plaintiff's claims will become moot once Plaintiff is removed from the sex offender registry in March 2016. (PFML's Br. at 22.) However, the Court need not consider PFML's argument at this juncture because it is based upon factual affidavits which are not intrinsic to the complaint or incorporated into it by reference. See Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Dykeman Carpentry, Inc., No. 13-CV-1508, 2014 WL 976822, at *5 (E.D.N.Y. Mar. 12, 2014).[3]

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Docket Entries 25, 36) are GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's due process claim is DISMISSED, but Defendants' motions are otherwise DENIED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    February __16__, 2016
          Central Islip, New York

---

[3] Similarly, because the Court finds that Plaintiff alleged a viable Fourth Amendment violation, the Court need not analyze the parties' arguments regarding supplemental jurisdiction.