UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
JOHN JONES,

                        Plaintiff,


        -against-                              MEMORANDUM & ORDER
                                              15-CV-0111(JS)(ARL)

COUNTY OF SUFFOLK and
PARENTS FOR MEGAN'S LAW,

                        Defendants.
--------------------------------------X
APPEARANCES
For Plaintiff:          Christopher T. Dunn, Esq.
                        Erin B. Harrist, Esq.
                        Aadhithi Padmanabhan, Esq.
                        New York Civil Liberties Union
                        125 Broad St., 19th Floor
                        New York, NY 10004

                        Jennifer Spirn, Esq.
                        Lawrence F. Spirn, Esq.
                        Spirn & Spirn
                        150 Motor Parkway, Ste. 401
                        Hauppauge, NY 11788

For County of
Suffolk:                Marlene Lange Budd, Esq.
                        Rudolph Max Baptiste, Esq.
                        Suffolk County Attorney's Office
                        H. Lee Dennison Building
                        100 Veterans Memorial Highway
                        P.O. Box 6100
                        Hauppauge, NY 11788

For Parents for
Megan's Law:            Michael Anthony Miranda, Esq.
                        Richard B. Epstein, Esq.
                        Miranda Sambursky Slone Sklarin
                          Verveniotis LLP
                        240 Mineola Blvd.
                        Mineola, NY 11501

SEYBERT, District Judge:

Plaintiff John Jones[1] ("Plaintiff") commenced this action against the County of Suffolk ("the County") and Parents for Megan's Law ("PFML" and collectively "Defendants") on January 9, 2015, alleging violations of his rights under the United States and New York Constitutions. (Compl., Docket Entry 1.)

On March 30, 2018, the Court granted the County's motion for summary judgment (County Mot., Docket Entry 119), and PFML's motion for summary judgment (PFML Mot., Docket Entry 120) and indicated that a decision would follow. The Court now sets forth its findings, reasoning, and conclusions.

BACKGROUND

I. Factual Background[2]

The Court assumes familiarity with its prior Order resolving the Defendants' motions to dismiss the Complaint. See Jones v. Cty. of Suffolk, 164 F. Supp. 3d 388 (E.D.N.Y. 2016).

A. The Contract with PFML

Plaintiff is a veteran who resides in Suffolk County

---

[1] On May 4, 2015, Plaintiff was granted permission to proceed under a pseudonym in this litigation. (May 2015 Order, Docket Entry 38.)

[2] The following material facts are drawn from Defendants' Local Civil Rule 56.1 Statements, (PFML 56.1 Stmt., Docket Entry 122; County 56.1 Stmt., Docket Entry 111-1), Plaintiff's Responses to Defendants' Local Civil Rule 56.1 Statements, (Pl.'s PFML Resp., Docket Entry 128; Pl.'s County Resp., Docket Entry 127), and Plaintiffs' Local Civil Rule 56.1 Counterstatement (Pl.'s 56.1

with his wife, Jane Jones, and their children. (Pl.'s 56.1 Counterstmt. ¶ 78; Mr. Jones Aff., Harrist Decl., Ex. 21, Docket Entry 129-21, ¶¶ 2-3, 6.) He pled guilty to attempted rape in 1992, served a four-year jail sentence, and was released on parole in 1996.[3] (PFML 56.1 Stmt. ¶¶ 74, 76; Pl.'s PFML Resp. ¶ 74; County 56.1 Stmt. ¶ 3; Pl.'s County Resp. ¶ 3; Mr. Jones Dep. 9:24-10:6.) He remained on parole until 1998. (Mr. Jones Dep. 10:15-21.) Since his conviction, Plaintiff has not been charged with any crimes or violations, but as a result of his conviction, Plaintiff was required to register as a sex offender. (Pl.'s 56.1 Counterstmt. ¶ 80; Mr. Jones Aff. ¶¶ 4-5.)

Pursuant to New York's Sex Offender Registration Act ("SORA"), sex offenders are required to register with the New York Staate Division of Criminal Justice Services (the "Division"). (Pl.'s PFML Resp. ¶¶ 3-4); see N.Y. Correction Law § 168-a(5),

---

Counterstmt., Docket Entry 126). Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

[3] An Offender Report submitted by PFML indicates that Plaintiff pled guilty to rape, not attempted rape. (Offender Rep., Miranda Decl., Ex. Q, Docket Entry 124-17, at 3.) However, a Sex Offender Information form maintained by the Suffolk County Police Department indicates that Plaintiff's guilty plea was for attempted rape. (SCPD Info. Form, Harrist Decl., Ex. 49, Docket Entry 129-49, at 1.) Because the parties cite to Plaintiff's testimony, and he testified that he pled guilty to attempted rape, the Court relies on that testimony for purposes of this Memorandum and Order. (See Mr. Jones Dep., Miranda Decl., Ex. B., Docket Entry 124-2, 9:24-10:6.)

168-f(1).  In connection with the SORA requirements, sex offenders are classified as level one ("Level One Offenders"), level two ("Level Two Offenders"), or level three offenders ("Level Three Offenders").  See N.Y. Correction Law § 168-l(6).  For as long as the offender is required to register, he or she is required to report his or her address to the Division on an annual basis, and for Level One and Level Two Offenders, to appear at a local law enforcement agency and provide a current photograph every three years.  (PFML 56.1 Stmt. ¶¶ 3-4; Pl.'s PFML Resp. ¶¶ 3-4); see N.Y. Correction Law § 168-f.  Level One Offenders remain on the registry for twenty years, and Level Two and Level Three Offenders are on the registry for life.  (PFML 56.1 Stmt. ¶ 81.)

When Plaintiff was released in 1996, he was required to register as a sex offender pursuant to SORA and re-register each year until he was removed from the registry.  (County 56.1 Stmt. ¶¶ 1, 43; Pl.'s County Resp. ¶ 1.)  Plaintiff testified that when he was released, he was classified as a Level One Offender.  (Pl.'s PFML Resp. ¶ 77; Pl.'s County Resp. ¶ 4; Mr. Jones Dep. 10:25-11:8.)  A Notice of Hearing from 2004 and a reclassification order from 2005 indicate that he was a Level Two Offender upon release and that he was re-classified as a Level One Offender on January 5, 2005. (PFML 56.1 Stmt. ¶¶ 77, 80; County 56.1 Stmt. ¶ 5; Notice of Hr'g, Miranda Decl., Ex. R, Docket Entry 124-18, at 1 ("You are currently registered as a level 2 sex offender."); Redetermination

Order, Miranda Decl., Ex. S, Docket Entry 124-19.)

According to Plaintiff, between approximately 1996 and 2012, SCPD detectives came to his home each year, verified that he still resided there, and asked to see his driver's license. (County 56.1 Stmt. ¶¶ 25, 39; Mr. Jones Dep. 101:20-103:19.) He testified that the incidents lasted two or three minutes and that on some occasions, he allowed them into his home. (County 56.1 Stmt. ¶ 40; Mr. Jones Dep. 102:19-103:14.) He also indicated that on at least one occasion, one of the detectives was carrying a firearm. (County 56.1 Stmt. ¶ 38; Pl.'s County Resp. ¶ 38; Mr. Jones Dep. 102:9-11.) Pursuant to SORA, from approximately 2005 to 2016, Plaintiff was also required to visit an SCPD precinct every three years to submit a photograph and fingerprints. (County 56.1 Stmt. ¶¶ 24, 33, 42.)

PFML is a not-for-profit organization that provides support to victims of sexual abuse, rape, violent crimes, hate crimes, and other crimes through victim counseling, advocacy, and referrals. (PFML 56.1 Stmt. ¶ 1.) Prior to February 2013, PFML received complaints from members of the community about the accuracy of the sex offender registry, including the addresses provided by sex offenders. (PFML 56.1 Stmt. ¶ 6.) Laura Ahearn was the executive director of PFML during the relevant period. (Ahearn Dep., Miranda Decl., Ex. U, Docket Entry 124-21, 8:5-8.)

Ahearn testified that in 2012, the Suffolk County

Executive and his staff requested that PFML develop a sex offender management plan for the County, including a proposal for in-person address verifications. (Pl.'s 56.1 Counterstmt. ¶¶ 1-2; Ahearn Dep. 9:3-10:25.) PFML developed the proposal--the "PFML Sex Offender Tracking and Community Support Program"--and presented it to the Suffolk County Legislature and the Legislature's Public Safety Committee. (Pl.'s 56.1 Counterstmt. ¶¶ 4-5; PFML Proposal, Harrist Decl., Ex. 52, Docket Entry 129-52.) Subsequently, in February 2013, the County passed the Community Protection Act ("CPA"), which among other things, authorized the Suffolk County Police Department ("SCPD") to contract with PFML to conduct address verifications of registered sex offenders. (PFML 56.1 Stmt. ¶ 2; County 56.1 Stmt. ¶¶ 14-15; CPA, Harrist Decl., Ex. 53, Docket Entry 129-53.) PFML and SCPD subsequently entered into a contract (the "Contract"), which provided that PFML would verify the addresses of registered sex offenders.[4] (PFML 56.1 Stmt. ¶ 8; Contract, Miranda Decl., Ex. K, Docket Entry 124-12.) The Contract became effective on May 1, 2013 and expired on April 30, 2016. (Contract at 1; PFML 56.1 Stmt. ¶ 9; County 56.1 Stmt. ¶ 16.)

Pursuant to the Contract, PFML agreed to use Registry Verification Field Representatives ("RVR" or "RVRs") to "conduct in-person Home Address Verifications for Level One, Level Two, and

_____

[4] PFML also agreed to render other services not relevant here. (PFML 56.1 Stmt. ¶ 8.)

Level Three Sex Offenders required to report pursuant to SORA, excluding Homeless Sex Offenders and persons currently incarcerated . . . utilizing Sex Offender Registry information available pursuant to New York State Corrections Law § 168-1 and/or identified through [PFML's] use of electronic data or other publically available information."  (Contract at 8, III(A)(2); PFML 56.1 Stmt. ¶ 18; County 56.1 Stmt. ¶ 61.)  The Contract defined an RVR as "a retired law enforcement officer, employed by [PFML], whose principal duties include in-person or other means of verification of Sex Offender home or work addresses."  (Contract at 5, I(E); PFML 56.1 Stmt. ¶ 19; County 56.1 Stmt. ¶ 62.)  The RVRs were required to conduct the verifications utilizing unmarked vehicles and to display identification that did "not resemble law enforcement identification nor include insignia that appears to be a law enforcement badge, shield or image."  (PFML 56.1 Stmt. ¶ 49; Contract at 8, III(A)(2)-(3).)  The identification cards displayed the RVR's name, picture, the organization ("Parents for Megan's Law & The Crime Victims Center"), the program ("Sex Offender Registration Verification Program"), and the phrase "[a] contract agency of the County of Suffolk."  (County 56.1 Stmt. ¶ 77; Pl.'s County Resp. ¶ 77; Identification Card, Harrist Decl., Ex. 50, Docket Entry 129-50.)

The Contract required PFML to verify the home addresses of Level One Offenders once a year and the home addresses of Level

Two and Level Three Offenders twice per year.  (PFML 56.1 Stmt.

¶ 25; Contract at 8, III(A)(5).)   Additionally, PFML agreed to

conduct work address verifications for Level Three Offenders and

to access publicly available records and data to confirm the work

addresses provided by Level Three Offenders.[5]  (Contract at 9,

III(B); PFML 56.1 Stmt. ¶¶ 15-16; Pl.'s PFML Resp. ¶ 15.)   The

Contract further required that each week, PFML submit a list of

the sex offenders scheduled for address verifications to SCPD, and

SCPD "reserve[d] the right to alter, reject or suspend any

scheduled in-person Home Address Verification at its sole

discretion."   (PFML 56.1 Stmt. ¶ 26; County 56.1 Stmt. ¶ 18;

Contract at 9, III(A)(6).)  An evaluation from 2014 indicates that

between May 1, 2013 and April 30, 2014, SCPD removed between ten

and forty-five percent of the offenders scheduled to be verified

each week.   (Pl.'s 56.1 Counterstmt. ¶ 19; Performance Eval.,

Harrist Decl., Ex. 16, Docket Entry 129-16, at 4.)   When it

conducted its review, SCPD removed any offenders who were the

subject of ongoing investigations and never added any sex offender

to the weekly lists provided by PFML.  (PFML 56.1 Stmt. ¶¶ 28-29.)

However, the parties agree that PFML decided which sex offenders

would be subject to address verifications each week, based on

---

[5] PFML points out, however, that during the term of the Contract,
PFML did not conduct any in-person work address verifications.
(PFML 56.1 Stmt. ¶ 17.)

"logistical considerations" and "the requirements of the [C]ontract." (PFML 56.1 Stmt. ¶ 27.)

PFML was also required to conduct address verifications "on an as needed basis upon [SCPD's] written request" and to provide written quarterly and annual reports to SCPD detailing, _inter alia_, the number and location of home address and work address verifications and the "number and method of inquiries or leads received by [PFML] and the action taken by [PFML] for each." (Contract at 9, III(A)(7); Contract at 11, VI(A).) SCPD agreed to provide information regarding the "disposition on any leads forwarded to [SCPD]" upon request. (Contract at 12, VI(C).)

There is some dispute regarding how PFML obtained registrants' information. Pursuant to SORA, PFML is designated as a vulnerable entity and is entitled to receive information from the Division about sex offenders in Suffolk County. (County 56.1 Stmt. ¶ 17.) PFML alleges that, as a result of its vulnerable entity status, it received registrants' information prior to entering into the Contract and continued to do so during the Contract term. (PFML Stmt. ¶¶ 10-12.) However, Plaintiff points out that pursuant to the Contract, SCPD agreed to "provide [PFML] with all information it is permitted to under New York State Correction Law § 168-1, including but not limited to all Suffolk County Level One notifications, which are limited to the approximate address based on the Sex Offender's zip code, all

notifications for Sex Offenders registered as 'homeless' and all registrants with an 'unknown' address." (Pl.'s PFML Resp. ¶ 12; Contract at 7, II(B)(1).)

B.  The Home Verification Program

Kenneth Rau, PFML's grant administrator, testified that the purpose of the address verification program was "to ensure that information provided on the registry was accurate so that people could act upon accurate information." (County 56.1 Stmt. ¶¶ 57, 60; Rau Dep., Harrist Decl., Ex. 4, Docket Entry 129-4, 19:16-20:5.) Ahearn gave similar testimony. (See Ahearn Dep. 117:11-23.) PFML's 2013-14 Annual Report to the County (required by the CPA) summarizes the program's purposes as the following:

> Parents for Megan's Law and the Crime Victims Center (PFML) was charged with developing and implementing a sex offender management plan for Suffolk County that would promote public safety and; ensure a more updated and accurate sex offender registry through in-person sex offender address verifications and collaboration with law enforcement agencies through the provision of potential felony out-of-compliance investigative leads; educate the community through the provision of prevention education programs and sex offender email alerts, and engage the community in reporting out-of-compliance registrants.

(2013-14 Annual Rep., Harrist Decl., Ex. 11, Docket Entry 129-11, at ECF p. 3.)  Additionally, Plaintiff points to statements made by Ahearn at several meetings of the Suffolk County Legislature and the Suffolk County Legislature Public Safety Committee

10

emphasizing that the address verification program would lead to increased enforcement and leads for law enforcement, (Jan. 31, 2012 Minutes, Harrist Decl., Ex. 41, Docket Entry 129-41, at 14 ("Address verification enhances law enforcement . . . and increases registration compliance. . . . So what we're going to do in supporting law enforcement is we're going to bring on two teams of two retired law enforcement staff will conduct in-person address verifications . . . and any inconsistencies are going to be transmitted and forwarded to Suffolk County P.D. for enforcement."); (Feb. 5, 2013 Tr., Harrist Decl., Ex. 42, Docket Entry 129-42, at 139 (discussing that stepping up enforcement will be "a direct result of everything that we've talked about in terms of address verification"); (Mar. 13, 2014 Minutes, Harrist Decl., Ex. 43, Docket Entry 129-43, at 15 (discussing the "type of leads and information that we are sending to law enforcement on the home address activities"), and press releases regarding the County's enforcement and monitoring efforts pursuant to the CPA and the partnership with PFML, (May 23, 2013 Press Release, Harrist Decl., Ex. 45, Docket Entry 129-45, at 1; Feb. 27, 2015 Press Release, Harrist Decl., Ex. 46, Docket Entry 129-46).

PFML alleges that SCPD did not provide any guidelines for executing the home verification program and was not aware of the procedures used by RVRs. (PFML 56.1 Stmt. ¶¶ 23-24.) However, Plaintiff alleges that the Contract provided guidance by

specifying the frequency of the home verifications and requiring that PFML provide a weekly schedule and quarterly and annual reports on the verifications to SCPD. (Pl.'s PFML Resp. ¶¶ 23-24.) Plaintiff further alleges that SCPD provided guidance regarding how to gather and report information to SCPD to ensure that the information could be used by the District Attorney's office in investigations or prosecutions. (Pl.'s PFML Resp. ¶ 23; see e.g., Rau Dep. 50:14-51:2.) The parties dispute whether SCPD was involved in the formulation of PFML's firearm policy but agree that PFML created its own use of force policy. (County 56.1 Stmt. ¶¶ 76, 78; Pl.'s County Resp. ¶ 78.) The parties further agree that other than the requirement that RVRs be retired law enforcement officers, SCPD did not have control over the hiring of RVRs and did not provide training to the RVRs.[6] (PFML 56.1 Stmt. ¶¶ 20-21; Pl.'s PFML Resp. ¶ 20.)

According to SCPD Detective Lieutenant Stephen Hernandez, the commanding officer of the Special Victims Unit and the County's Rule 30(b)(6) witness, SCPD received documentation regarding every address verification conducted by PFML. (County 56.1 Stmt. ¶¶ 81, 84; Pl.'s County Resp. ¶ 84; Hernandez Dep., Harrist Decl., Ex. 6, Docket Entry 129-6, 24:7-11.) Additionally,

_____

[6] The parties dispute who trained the RVRs, but appear to agree that to the extent they were trained, it was by PFML employees. (See PFML 56.1 Stmt. ¶¶ 22; Pl.'s PFML Resp. ¶ 22; County 56.1 Stmt. ¶ 59; Pl.'s County Resp. ¶ 59.)

while SCPD and PFML had different systems for maintaining the records from address verifications, SCPD developed the forms that PFML used to gather information. (County 56.1 Stmt. ¶¶ 96, 107.) For example, if an address verification was successful, and the information in the registry was confirmed, PFML used a blue form to document the verification and relevant information was entered into a SCPD Special Victims Unit database. (Pl.'s 56.1 Counterstmt. ¶¶ 23, 25; Rau Dep. 51:10-22; Hernandez Dep. 71:10-14.) PFML reported potential violations to SCPD on different forms, on which PFML could indicate that the offender "failed to register as required" or "refused to cooperate with address verification," or that the address "was unable to be confirmed for the reason(s) provided." (Pl.'s 56.1 Counterstmt. ¶¶ 27, 28-29, Rainbow Form Samples, Harrist Decl., Ex. 18, Docket Entry 129-18, at 1-2.)

Address verifications were usually conducted by two RVRs, one of which was the primary RVR who talked to the offender and made notes about the verification. (PFML 56.1 Stmt. ¶ 37; County 56.1 Stmt. ¶ 71.) Occasionally, a third RVR was also present, and if so, that RVR waited near the vehicle.[7] (PFML 56.1 Stmt. ¶¶ 38-39; Pl.'s PFML Resp. ¶ 38.) The RVRs typically wore

---

[7] Rau testified that the third RVR stays near the car because it could be "intimidating" if three RVRs approached the offender's home. (PFML 56.1 Stmt. ¶ 40; Pl.'s PFML Resp. ¶ 40; Rau Dep. 75:5-12.)

slacks, a dress shirt, and a tie. (PFML 56.1 Stmt. ¶ 52.) Although the Contract specified that the identification cards worn by RVRs could not resemble law enforcement badges, Rau testified that it was possible that, in part due to the identification cards worn by RVRs, the RVRs could be mistaken for police officers. (PFML 56.1 Stmt. ¶ 50; Pl.'s PFML Resp. ¶ 50; Rau Dep. 123:4-15.) Mrs. Jones, Plaintiff's wife, testified that she assumed the RVRs were police officers when they came to her home based on the way they were dressed and their identification cards. (Pl.'s PFML Resp. ¶ 50; Mrs. Jones Dep., Harrist Decl., Ex. 26, Docket Entry 129-26, 20:13-21:16.)

After PFML conducted an address verification,[8] it notified SCPD if there was a possible error or inconsistency with the information on the registry or if a particular offender's address could not be verified. (PFML 56.1 Stmt. ¶ 30.) While there may be no immediate consequences, if the RVRs were unable to verify the address of a particular offender, SCPD would receive a tip, and generally, a detective from SCPD would visit the offender's home. (PFML 56.1 Stmt. ¶ 43; Pl.'s PFML Resp. ¶ 43; County 56.1 Stmt. ¶ 69; Pl.'s County Resp. ¶ 69; Giordano Dep., Miranda Decl., Ex. L, Docket Entry 124-13, 58:8-21; Hernandez Dep.

---

[8] Pursuant to PFML's policy, if the offender was not home, RVRs could attempt to verify the address up to five times. (Oct. 2014 Letter, Pl.'s Ex. 15, Docket Entry 129-15, at 1-2.)

76:5-78:20; 2013-14 Annual Rep. at ECF p. 4 (reporting that PFML transmitted 927 investigative leads during the time period covered by the Report).) Specifically, Hernandez testified that when SCPD received information from PFML that an offender failed to cooperate, SCPD would open an investigation. (Pl.'s County Resp. ¶ 86; Hernandez Dep. 78:7-20.) However, he testified that the information was only a tip and that further investigation would be necessary to develop probable cause and make an arrest.[9] (County 56.1 Stmt. ¶ 98.) The 2013-14 Annual Report stated that "99% of registrants were cooperative with PFML Registry Verification . . . staff," and PFML transmitted 42 "refusal to cooperate investigative leads" and 173 "failure to register home address felony leads" during that time period. (PFML 56.1 Stmt. ¶¶ 46-47; Pl.'s PFML Resp. ¶¶ 46-47; Pl.'s 56.1 Counterstmt. ¶ 54; 2013-14 Annual Rep. at ECF p. 4, 7.) As of April 2016, nineteen offenders were arrested "for a criminal offense as a result of address verifications conducted pursuant to the Community Protection Act." (Pl.'s 56.1 Counterstmt. ¶ 53; County's Am. Resp. to Interrogs., Harrist Decl., Ex. 48, Docket Entry 129-48, ¶ 3 at 5, & Ex. F at 7-11.)

---

[9] Detective Giordano, who was assigned to SCPD Special Victims Unit, testified that she was not aware of any consequences for offenders that did not cooperate with SCPD when SCPD detectives conducted the address verifications prior to the enactment of the CPA. (Pl.'s County Resp. ¶ 102; Giordano Dep. 20:3-21.)

PFML maintains that after it transmitted a tip, "PFML's involvement in the matter [was] concluded," and SCPD did not provide any updates to PFML regarding its use of the information. (PFML 56.1 Stmt. ¶¶ 31, 35.)  However, Plaintiff counters that PFML received information from SCPD about the leads it provided. (Pl.'s PFML Resp. ¶ 31, 35; Rau Dep. 102:16-103:2; Hernandez Dep. 73:3-10.)  Additionally, at least one RVR testified in a case against a sex offender regarding information gathered during an address verification.  (Pl.'s PFML Resp. ¶ 30; McCormack Dep., Harrist Decl., Ex. 17, Docket Entry 129-17, 22:19-25:19.)  In any event, the parties agree that PFML was not involved in any arrests and that SCPD retained sole discretion regarding how to use the leads provided by PFML.  (PFML 56.1 Stmt. ¶¶ 32, 34.)

The parties vigorously dispute whether cooperation with the RVRs was voluntary; based on testimony by PFML personnel, PFML alleges that compliance was voluntary, but Plaintiff, relying on his and his wife's testimony, a letter sent by SCPD, a conversation with SCPD, and the nature of the address verifications, alleges that sex offenders were told that compliance was required.[10]  (PFML 56.1 Stmt. ¶ 42; Pl.'s PFML Resp. ¶ 42.)  PFML personnel testified that RVRs were trained to end the verification and leave the property if the sex offender refused to cooperate.  (PFML 56.1

_____

[10] These facts are discussed in greater detail below.

16

Stmt. ¶ 44; County 56.1 Stmt. ¶¶ 63, 67; Rau Dep. 40:8-42:9; Waser Dep., Miranda Decl., Ex. E, Docket Entry 124-5, 18:24-19:11; McCormack Dep. 17:20-18:8.)  PFML personnel also testified that RVRs were advised to avoid confrontation.  (PFML 56.1 Stmt. ¶ 48; Rau Dep. 23:11-27:10; McCormack Dep. 17:20-18:8.)  However, one RVR testified that he never received training on conducting the verifications, (Carboine Dep., Harrist Decl., Ex. 2, Docket Entry 129-2, 14:3-11) and that occasionally, the RVRs "would talk to [the offender] and try to get them to comply with what we wanted" by telling them "that if the verification wasn't completed by us we would in turn have to report this to [SCPD]." (Carboine Dep. 34:19-35:6.)  (Pl.'s PFML Resp. ¶ 44.)  It appears that some RVRs used "verbal judo"--a technique used by law enforcement for several purposes, including to encourage compliance--during the address verifications.  (County 56.1 Stmt. ¶¶ 65-66; Pl.'s PFML Resp. ¶ 44; Carboine Dep. 41:14-44:5; Rau Dep. 23:16-28:11.)  If an offender asked the RVRs whether he or she was required to comply, Rau testified that RVRs were trained to tell the offender that the RVRs were there to "verify" and that the offender was "not compelled to give us the information."  (Pl.'s PFML Resp. ¶ 45; Rau Dep. 41:14-42:9.)  Ahearn testified that it was possible for the RVRs to verify the offender's address without their cooperation, including through a "visual identification." (County 56.1 Stmt. ¶ 72; Pl.'s County Resp. ¶ 72; Ahearn Dep. 81:6-18.)

C.  The SCPD Letter

After the address verification program began, Ahearn contacted SCPD because PFML heard that SCPD officers were informing offenders that "they d[id] not have to cooperate with [PFML] staff for address verifications."  (PFML 56.1 Stmt. ¶ 55; Pl.'s PFML Resp. ¶ 55; June 2013 E-mail, Harrist Decl., Ex. 30, Docket Entry 129-30.)  Based on this information, as well a threat made by an offender to PFML staff and an incident during which an offender ordered his dogs to attack the RVRs, PFML became concerned about the RVRs' safety.  (PFML 56.1 Stmt. ¶¶ 56-60; Pl.'s PFML Resp. ¶¶ 56-60.)  The Chief of SCPD made the decision to send a letter to offenders to advise them of the Contract between the County and PFML and ordered Detective Lieutenant Hernandez to draft the letter.[11]  (Pl.'s 56.1 Counterstmt. ¶¶ 39-40; Hernandez Dep. 42:20-44:11.)

Thereafter, Hernandez sent a letter to offenders (the

---

[11] The parties dispute whether the purpose behind the SCPD Letter was to protect the RVRs or to address PFML's concerns regarding cooperation.  (See, e.g., County 56.1 Stmt. ¶ 20; Pl.'s County Resp. ¶ 20.)  Hernandez testified during his deposition that the Letter was written after receiving "complaints from [PFML] that some of the sex offenders were not being receptive to their RVRs" and was intended to "encourage cooperation."  (Pl.'s County Resp. ¶ 20; Hernandez Dep. 42:24-43:15.)  He further testified that he "wanted to keep everybody safe."  (Hernandez Dep. 43:22-23.)  Brian McCormack, one of the RVRs, agreed during his deposition that giving registrants a copy of the Letter occasionally resulted in increased cooperation.  (McCormack Dep. 34:16-25.)

"SCPD Letter" or the "Letter") advising them that SCPD and PFML "entered into a contract for the purpose of conducting verifications of registered sex offenders residential and employment addresses." (PFML 56.1 Stmt. ¶ 63; County 56.1 Stmt. ¶ 19; SCPD Letter, Miranda Decl., Ex. V, Docket Entry 124-22.) The SCPD Letter stated that "[r]egistered sex offenders are required to provide this information under the New York State Sex Offender Registration Act, also known as Megan's Law." (SCPD Letter.) The Letter further explained that RVRs from PFML would be visiting them to "conduct in person residence verifications" and that the offender would be asked "to provide them with personal identification of a verifiable source, (e.g. a NY State Driver's License or NY State Identification Card) or other accepted forms of documentation that provides current address information." (SCPD Letter.) Finally, the Letter advised that the offender "may be requested to provide . . . employment information to the representative." (SCPD Letter.) PFML provided the postage for mailing the SCPD Letter. (Pl.'s Counterstmt. ¶ 50; July 16, 2013 E-mail, Harrist Decl., Ex. 56, Docket Entry 129-56.)

The parties dispute whether the Letter gave the impression that cooperation with the RVRs was mandatory. (PFML 56.1 Stmt. ¶ 66; Pl.'s PFML Resp. ¶ 66.) In an email seeking approval of the draft Letter, Hernandez explained that "some of our sex offenders are not being cooperative with PFML verification

personnel" and that he anticipated that when the RVRs visited an offender's home or employer, a copy of the Letter would be provided. (Pl.'s PFML Resp. ¶ 63; Hernandez E-mail, Harrist Decl., Ex. 31, Docket Entry 129-31, at 1.) Additionally, Hernandez testified at his deposition that there was less resistance from offenders after the Letter was sent. (Pl.'s Counterstmt. ¶ 51; Hernandez Dep. 19:25-20:7.) When asked about the SCPD Letter, Plaintiff agreed that there was no language in the Letter specifying that "a failure to comply . . . [was] a felony or any sort of crime." (Mr. Jones Dep. 34:6-9.) Hernandez testified that he told his detectives that if any offenders called with inquiries related to the SCPD Letter, they were to advise the offender that SCPD "encourage[s] cooperation," but if the offender asked if they had to cooperate with the RVRs, the detectives should tell them "[t]he answer is no."[12] (County 56.1 Stmt. ¶ 89; Hernandez Dep. 52:22-53:15.)

D. <u>Plaintiff's Address Verifications</u>

In approximately June 2013, Mr. and Mrs. Jones received the SCPD Letter. (PFML 56.1 Stmt. ¶ 126; Mrs. Jones Dep. 14:16-22.) After Plaintiff showed the Letter to his wife, she called SCPD and asked a male officer if her husband "had to abide by this [L]etter and he said that [her husband] should answer the

---

[12] Plaintiff maintains that this testimony conflicts with what his wife was told by a SCPD detective. (<u>See</u> Section I.D.)

questions, [and] not to be rude to the people from Megan's Law."
(PFML 56.1 Stmt. ¶ 128; Pl.'s 56.1 Counterstmt. ¶ 85; Mrs. Jones
Dep. 16:10-17:5; Mr. Jones Dep. 23:25-24:2.)  Mrs. Jones testified
that the officer did not indicate that there would be penalties if
her husband refused to cooperate.  (PFML 56.1 Stmt. ¶ 130; Pl.'s
PFML Resp. ¶ 129; Mrs. Jones Dep. 17:10-12.)  Mr. Jones testified
that after the call, his wife relayed the information to him.
(Pl.'s 56.1 Counterstmt. ¶ 91; Mr. Jones Dep. 24:25-26:3.)

   1. August 2013 Verification

      On August 6, 2013, RVRs Mike Waser and Robert Carboine
went to Plaintiff's residence to conduct an address verification.
(PFML 56.1 Stmt. ¶ 95; County 56.1 Stmt. ¶ 12.)  Plaintiff's wife
testified that after the RVRs knocked on the door, the couple's
son answered and told her that someone was at the door.  (PFML
56.1 Stmt. ¶¶ 96, 99.)  Mrs. Jones testified that when she came to
the front door, the RVRs were "about a foot" from the front door.
(Mrs. Jones Dep. 23:2-5.)  They asked to speak to Plaintiff, and
Mrs. Jones told them that he was in the shower.  (PFML 56.1 Stmt.
¶¶ 101-02.)  She testified that she asked them to identify
themselves, and they told her they were from PFML.  (Mrs. Jones
Dep. 22:13-23:10.)  They also stated that they were there to do "a
house check" and "want[ed] to know if this is where [Plaintiff]
lives." (PFML 56.1 Stmt. ¶ 110; Pl.'s PFML Resp. ¶ 111; Mrs. Jones
Dep. 24:8-16.)  She testified that the RVRs waited outside for

approximately fifteen minutes until Plaintiff finished his shower, but admitted that her "time concept is really not that good."[13] (PFML 56.1 Stmt. ¶¶ 103, 106; County 56.1 Stmt. ¶ 54; Mrs. Jones Dep. 26:4-7.)  Mrs. Jones testified in an affidavit that when she asked the RVRs "whether they had the authority to question my husband at our home," one of them said "they could do what they wanted because they were from Parents for Megan's Law."  (Mrs. Jones Aff., Harrist Decl., Ex. 27, Docket Entry 129-27, ¶ 8.)  When asked if the RVRs were armed, Mrs. Jones testified that she "didn't see any guns," and Plaintiff testified that he did not know if the RVRs were armed.[14]  (PFML 56.1 Stmt. ¶¶ 112, 125; Pl.'s PFML Resp. ¶¶ 112, 125; Mrs. Jones Dep. 22:2-5; Mr. Jones Dep. 44:3-4.)  She also said that the RVRs never asked to enter the home and that she did not ask them to leave.  (PFML 56.1 Stmt. ¶¶ 113-14; County 56.1 Stmt. ¶ 53.)  Additionally, Mr. Jones testified that they did not request permission to enter his home or vehicle.  (PFML 56.1 Stmt. ¶ 136.)  Mrs. Jones testified that she felt threatened "[j]ust lookwise and just because they were Parent's for Megan's

---

[13] PFML notes that neither Plaintiff nor his wife called SCPD or their attorney during this time.  (PFML 56.1 Stmt. ¶¶ 104-05.)

[14] Plaintiff points out that the RVRs who conducted the first address verification, Waser and Carboine, both testified that they carried guns during address verifications.  (Pl.'s PFML Resp. ¶ 112; Carboine Dep. 17:11-23 (testifying that he carried a gun "almost everyday"); Waser Dep. 25:22-26:1 (testifying that he carried a gun "on occasion" or "very rarely").)

Law," and that "[she] felt [her] privacy was invaded, especially with all the children in the house and the neighbors." (Pl.'s PFML Resp. ¶ 116; Mrs. Jones Dep. 25:20-23.)

Plaintiff testified that he got out of the shower and came to the door about fifteen minutes after the RVRs arrived. (Mr. Jones Dep. 38:11-21.) Carboine testified that he did not "ever remember waiting 15 minutes because someone was in the shower," but acknowledged that he did not have any recollection of this particular address verification. (PFML 56.1 Stmt. ¶¶ 107-08; Pl.'s PFML Resp. ¶¶ 107-08; Carboine Dep. 59:25-60:10, 62:13-63:10.) Mr. Jones testified that when he got to the door, the RVRs were waiting in the walkway about five feet from his house. (PFML 56.1 Stmt. ¶ 118.) In an affidavit, Mr. Jones testified that the RVRs also "asked [him] a series of questions, including where [he] work[ed] and how long [he] ha[d] worked there."[15] (Mr. Jones Affidavit ¶ 10.) At that point, Plaintiff and the RVRs walked to his truck--which was parked in the street about thirty or forty feet from the front door--to retrieve his driver's license; according to Plaintiff, the RVRs followed about two feet behind him while he walked to his vehicle. (PFML 56.1 Stmt. ¶¶ 120-22; Pl.'s 56.1 Counterstmt. ¶ 114; Mr. Jones Dep. 45:9-15.) Plaintiff testified that after he gave the primary RVR his license,

---

[15] PFML alleges that the RVRs never asked Level One Offenders about their employment. (PFML 56.1 Stmt. ¶ 54.)

he said "[w]e may see you at your job." (Pl.'s PFML Resp. ¶ 123;
Mr. Jones Dep. 47:3-5.) Then, the RVRs left. (PFML 56.1 Stmt.
¶ 123.) A Verification Report was completed after the address
verification indicating that the verification was successful and
noting Plaintiff's driver's license number and expiration date.
(PFML 56.1 Stmt. ¶¶ 137-38; First Verification Rep., Miranda Decl.,
Ex. I, Docket Entry 124-10.)

Plaintiff testified that less than five minutes elapsed
from the time he came to the door to when the RVRs left; Mrs. Jones
estimated that it was ten minutes. (PFML 56.1 Stmt. ¶ 124; Pl.'s
PFML Resp. ¶ 124; County 56.1 Stmt. ¶ 27; Pl.'s County Resp. ¶ 27;
Mrs. Jones Dep. 28:11-16.) Mr. Jones testified that he did not
ask the RVRs whether he was required to answer their questions or
whether there would be consequences if he did not cooperate. (PFML
56.1 Stmt. ¶ 133; Mr. Jones Dep. 49:9-14.) He also testified that
the RVRs did not threaten or insult him in any way. (PFML 56.1
Stmt. ¶ 134-35; County 56.1 Stmt. ¶ 28.) Nonetheless, Mr. Jones
stated that he believed he would face penalties if he failed to
cooperate with the RVRs, including being arrested, and that he
believed that he was required to comply with their requests.
(Pl.'s 56.1 Counterstmt. ¶ 109; Mr. Jones Dep. 30:24-31:5, 118:10-
16.)

2. July 2014 Verification

On July 2, 2014, two RVRs attempted to conduct an address

verification at Plaintiff's residence but were told by his mother-in-law that he was not home. (PFML 56.1 Stmt. ¶ 147; Pl.'s 56.1 Counterstmt. ¶ 119.)

On July 9, 2014, two RVRs, Mike Waser and Brian McCormack, returned to Plaintiff's home to verify his address. (PFML 56.1 Stmt. ¶ 148; County 56.1 Stmt. ¶ 11.) Plaintiff testified that when he came to the door, one of the RVRs was waiting "at the bottom of the step" and one was approximately fifteen feet from the front door. (Pl.'s 56.1 Counterstmt. ¶ 124; Mr. Jones Dep. 60:9-16.) He further testified that a third RVR was waiting by the car and that none of the RVRs showed any identification. (PFML 56.1 Stmt. ¶ 149; Pl.'s 56.1 Counterstmt. ¶ 123; Mr. Jones Dep. 60:15-62:19.) He testified that one of the RVRs was not armed, and that he did not know if the second RVR was armed.[16] (PFML 56.1 Stmt. ¶ 154; Pl.'s PFML Resp. ¶ 154; Mr. Jones Dep. 61:7-25.) The RVR closest to him asked him questions and requested that he produce identification, and Plaintiff walked to his truck, which was parked on the street about thirty to forty feet away, to retrieve his driver's license while the primary RVR

---

[16] Plaintiff points out that the RVRs who conducted the second address verification, Waser and McCormack, both testified that they carried guns during address verifications. (Pl.'s PFML Resp. ¶ 154; McCormack Dep. 20:11-21:10 (testifying that he carried a firearm most days, including during address verifications); Waser Dep. 25:22-26:1 (testifying that he carried a gun "on occasion" or "very rarely").)

followed him. (PFML 56.1 Stmt. ¶ 151; Pl.'s 56.1 Counterstmt. ¶¶ 125-27; Mr. Jones Dep. 64:10-20.) Plaintiff testified that when he gave the RVR his license, he "told him not to laugh at [his] picture," and the RVR "laughed" and said "[m]y picture is not that good either." (PFML 56.1 Stmt. ¶ 152; Pl.'s PFML Resp. ¶ 152; Mr. Jones Dep. 65:7-11.)

Plaintiff indicated that the entire verification lasted approximately two minutes. (PFML 56.1 Stmt. ¶ 153; County 56.1 Stmt. ¶ 30; Pl.'s County Resp. ¶ 30.) According to Plaintiff, the RVRs did not threaten him, speak rudely to him, or request permission to enter his home or vehicle. (PFML 56.1 Stmt. ¶¶ 155-57; County 56.1 Stmt. ¶ 31.) Additionally, Plaintiff did not ask the RVRs to leave or whether he was required to comply, or call SCPD or his attorney during the verification. (PFML 56.1 Stmt. ¶¶ 159-62; County 56.1 Stmt. ¶ 31.) The RVRs completed a Verification Report documenting the visit indicating that the verification was successful and noting Plaintiff's driver's license number and expiration date. (PFML 56.1 Stmt. ¶¶ 163-64; Second Verification Rep., Miranda Decl., Ex. J, Docket Entry 124-11.)

PFML did not attempt to verify Plaintiff's address in 2015. (PFML 56.1 Stmt. ¶ 167.) On March 16, 2016, Plaintiff was removed from the registry, and as a result, he is no longer subject to address verifications and the requirements of SORA. (PFML 56.1

Stmt. ¶¶ 82-83; County 56.1 Stmt. ¶ 24.)

II.  Procedural Background

     The Complaint, filed on January 9, 2015, asserts claims for violations of Plaintiff's right to be free from unreasonable search and seizure and his right to due process under the United States and New York Constitutions.  (Compl. ¶¶ 65-66, 68-69.) Additionally, he claims that the CPA violates the New York Constitution because it is pre-empted by SORA.  (Compl. ¶ 67.) The County and PFML moved to dismiss on March 10, 2015 and April 17, 2015, respectively.  (See County Mot. to Dismiss, Docket Entry 25; PFML Mot. to Dismiss, Docket Entry 36.)

     A.  The Court's February 16, 2016 Order

     The Court granted in part and denied in part Defendants' motions to dismiss.  Initially, the Court determined that Plaintiff's allegations were sufficient to find that PFML was a state actor under either the joint action or public function tests. Jones, 164 F. Supp. 3d at 397.  The Court found that Plaintiff's allegations that SCPD dictated how many visits each offender would receive, that PFML submitted the verification schedule to SCPD each week for modification and approval, and the allegations related to the SCPD Letter were adequate to allege that the County acted jointly with PFML.  Id. at 396.  Additionally, the Court held that because the allegations demonstrated that "the County delegated to PFML the inherently public function of monitoring sex

27

offenders," the elements of the public function test were also satisfied.  Id. at 396-97.

Next, the Court considered whether Plaintiff adequately alleged a violation of his Fourth Amendment rights.  Id.  The Court found that the allegations--including those related to the SCPD Letter and the conduct of the RVRs during the address verifications--"raise[d] questions about whether a reasonable person in Jones' position would feel free to terminate his interactions with PFML."  Id. at 398.  Further, the Court explained that these allegations "give[ ] the encounter the appearance of a seizure of Jones' person, rather than a consensual 'knock and talk,'" which was found to be permissible in Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495, (2013).  Id. at 397-98.  Therefore, the Court denied Defendants' motions to dismiss the Fourth Amendment claim.  Id. at 398.  Additionally, the Court denied the County's motion to dismiss Plaintiff's claim under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Id. at 399-400.

However, after analyzing Plaintiff's substantive due process claim, the Court dismissed that claim as duplicative of the Fourth Amendment claim.  Id. at 398-99.

B.  Defendants' Summary Judgment Motions

The County and PFML moved for summary judgment on August 24, 2017.  (See County Mot., PFML Mot.)  On September 29,

2017, Plaintiff opposed Defendants' motions, and the County and PFML filed reply briefs on October 12, 2017 and October 13, 2017, respectively.  (Pl.'s Opp. Br., Docket Entry 125; County Reply, Docket Entry 130; PFML Reply, Docket Entry 131.)

DISCUSSION

## I.  Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at

*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. The State Actor Doctrine

The County and PFML argue that PFML is not a state actor under 42 U.S.C. § 1983 ("Section 1983"). (County Br., Docket Entry 119-26, at 13-15; PFML Br., Docket Entry 123, at 8-11.) The County argues that PFML is not a state actor under the joint action test because SCPD was not involved in training PFML staff or developing PFML's procedures. (County Br. at 13.) Additionally, the County contends that PFML "determined which individuals would be verified[ ] and who would conduct the verifications." (County Br. at 13.) The County argues that PFML is also not a state actor under the public function test because it was not engaged in a law enforcement activity, but an "administrative undertaking to verify the integrity of publically available information." (County Br. at 14.) According to the County, PFML's role was limited to "ministerial and information gathering functions only." (County

Br. at 15.)  PFML makes similar arguments and points out that although the Court found that Plaintiff sufficiently alleged that PFML was a state actor at the motion to dismiss stage, the evidence undermines the Complaint's allegations related to state action. (PFML Br. at 8.)  PFML contends that it acted independently, that the County did not manage the address verification program, and that address verifications were "an administrative function that was not traditionally within the exclusive province of the state." (PFML Br. at 8-9.)  Relevant to the public function test, PFML maintains that because the address verification program did not exist prior to the enactment of the CPA, PFML could not have been performing an activity "exclusively within the realm of the state." (PFML Br. at 11.)

Plaintiff argues that the Court should deny Defendants' motions on this ground because all of the allegations the Court relied on in its February 16, 2016 Order have been substantiated by admissible evidence. (Pl.'s Opp. Br. at 8.)  Plaintiff contends that PFML is a state actor under the joint function test because, inter alia, the County dictated how often PFML would verify offenders' addresses, developed the forms used by PFML to gather information, fielded inquiries from offenders and informed them they did not have to cooperate, and opened investigations based on tips from PFML.  (Pl.'s Opp. Br. at 11.)  Additionally, Plaintiff argues that PFML was performing a public function by monitoring

sex offenders, especially in light of evidence demonstrating that SCPD detectives visited offenders' homes prior to SCPD entering into the Contract with PFML. (Pl.'s Opp. Br. at 12-13.) Finally, Plaintiff claims that the evidence shows that by forwarding leads to SCPD, PFML was engaged in criminal investigations. (Pl.'s Opp. Br. at 13.)

A. <u>State Action Generally</u>

Section 1983 provides individuals with "a method for vindicating federal rights," including those rights conferred by the United States Constitution. <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694, 61 L. Ed. 2d 433 (1979). To state a claim under Section 1983, a plaintiff must demonstrate that the defendant deprived him of a federal or constitutional right while acting under color of state law. <u>Cox v. Warwick Valley Cent. Sch. Dist.</u>, 654 F.3d 267, 272 (2d Cir. 2011). The state action requirement exists "[b]ecause the United States Constitution regulates only the Government, not private parties." <u>Flagg v. Yonkers Sav. & Loan Ass'n</u>, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks and citation omitted).

It is well established that "a private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" <u>Fabrikant v. French</u>, 691 F.3d 193, 207 (2d Cir. 2012) (quoting <u>Cranley v. Nat'l Life Ins. Co. of Vt.</u>, 318

F.3d 105, 112 (2d Cir. 2003). Additionally, the existence of a contract between the private entity and the State--standing alone--does not render a private entity a state actor under Section 1983. See, e.g., Grogan v. Blooming Grove Volunteer Ambulance Corps., 768 F.3d 259, 269 (2d Cir. 2014) (holding that volunteer ambulance company was not a state actor under entwinement test despite contract between the company and the town). Rather, "[f]or the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Cranley, 318 F.3d at 111 (internal quotation marks and citations omitted).

Although there is no one standard for determining whether an entity is a state actor, several tests have emerged. See Fabrikant, 691 F.3d at 207 (explaining that there is "'no single test to identify state actions and state actors.'") (quoting Cooper v. U.S. Postal Serv., 577 F.3d 479, 491 (2d Cir. 2009)). Specifically, courts have found a private party's actions to be attributable to the state when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3)

when the entity "has been delegated a public
function by the [s]tate," ("the public
function test").

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255,

257 (2d Cir. 2008) (quoting Brentwood Acad. v. Tenn. Secondary

Sch. Athletic Ass'n, 531 U.S. 288, 296, 121 S. Ct. 924, 930, 148

L. Ed. 2d 807 (2001)).  "The fundamental question under each test

is whether the private entity's challenged actions are 'fairly

attributable' to the state."  Fabrikant, 691 F.3d at 207 (quoting

Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S. Ct. 2764, 2770,

73 L. Ed. 2d 418 (1982)).  This inquiry is fact specific and begins

with an examination of the conduct at issue.  See Brentwood, 531

U.S. at 295, 121 S. Ct. at 930, 148 L. Ed. 2d 807.

The Second Circuit has instructed that when faced with

"whether a private entity acts under color of state law for

purposes of § 1983," the district court should identify "the

specific conduct of which the plaintiff complains, rather than the

general characteristics of the entity."  Fabrikant, 691 F.3d at

207 (internal quotation marks and citation omitted).  Moreover,

the plaintiff must demonstrate that "the state was involved 'with

the activity that caused the injury' giving rise to the action."

Sybalski, 546 F.3d at 257-58 (quoting Schlein v. Milford Hosp.,

Inc., 561 F.2d 427, 428 (2d Cir. 1977)) (emphasis omitted).

As discussed, the Court previously held at the motion to

dismiss stage that Plaintiff's allegations were sufficient to meet

either the joint action or public function tests.  The Court will address each theory in turn.

B.  The Joint Action or Close Nexus Test

For an entity to be considered a state actor under the joint action or close nexus test, there must be a "sufficiently close nexus between the State and the challenged action."[17]  Lynch v. Southampton Animal Shelter Found., Inc., 971 F. Supp. 2d 340, 351 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).  "The requisite nexus between the State and the challenged conduct exists 'where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid.'"  Spavone v. Transitional Servs. of N.Y. Supportive Housing Prog., No. 16-CV-1219, 2016 WL 2758269, at *4 (E.D.N.Y. May 12, 2016) (quoting Abdullahi v. Pfizer, Inc., 562 F.3d 163, 188 (2d Cir. 2009)). Further, under what has been referred to as the entwinement theory, "[a] private entity may be considered a state actor 'when it is entwined with governmental policies, or when government is entwined in its management or control.'"  Grogan, 768 F.3d at 264 (quoting Brentwood, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807).  The decisive factor is the degree

---

[17] Courts seem to use the terms joint action and close nexus interchangeably.  For the sake of clarity, the Court will refer to this test as the joint action test for purposes of this Memorandum and Order.

of control that the government exercises over the private party's activities. Id. at 269. Finally, after the Supreme Court's decision in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961), several courts have considered a private entity to be a state actor when the state has "'so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.'" Lynch, 971 F. Supp. 2d at 352 (quoting Hollman v. Cty. of Suffolk, No. 06-CV-3589, 2011 WL 2446428, at *7 (E.D.N.Y. June 15, 2011)).

The Court is unpersuaded by Defendants' arguments and concludes that the evidence is sufficient to establish that PFML is a state actor under the joint action test because the County worked with PFML to administer the program and maintained control over certain aspects of the program. As the Court indicated in its prior Order, see Jones, 164 F. Supp. 3d at 396, the Contract dictated how many visits each sex offender would receive, SCPD retained discretion to modify the schedule of visits on a weekly basis, and most significantly, the SCPD Letter created the appearance of joint action. (See Section I.C.; Contract at 8-9, III(A)(5)-(A)(6).) Additionally, SCPD assisted with developing PFML's forms for documenting information obtained during address verifications and fielded inquiries from offenders regarding the address verification program. (County 56.1 Stmt. ¶¶ 89, 107; PFML

56.1 Stmt. ¶¶ 128-30.)  Moreover, in this case, the evidence demonstrates SCPD's involvement in the address verification program specifically--"'the activity that caused the injury' giving rise to the action." Sybalski, 546 F.3d at 257-58 (quoting Schlein, 561 F.2d at 428).

PFML cites several cases, including Rendell-Baker v. Kohn, 457 U.S. 830, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982), to support its argument that PFML is not a state actor under the joint action test.  (PFML Br. at 10.)  In Rendell-Baker, the Supreme Court concluded that a school that was regulated by the state and received substantial government funding was not a state actor for purposes of a Section 1983 claim.  Rendell-Baker 457 U.S. at 839-43, 102 S. Ct. at 2770-72, 73 L. Ed. 2d 418.  However, the basis for finding PFML to be a state actor is neither extensive regulation nor government funding, and as a result, Rendell-Baker is not instructive here.  Neither is Shapiro v. Goldman, No. 14-CV-10119, 2016 WL 4371741, at *10-11 (S.D.N.Y. Aug. 15, 2016), aff'd, 696 F. App'x 532 (2d Cir. 2017), in which the court found that a non-profit corporation that analyzed no-fault insurance claims and forwarded tips to law enforcement was not a state actor. As discussed above, PFML and SCPD's relationship went beyond PFML forwarding unsolicited information to SCPD.  The Court also finds the relationship between Facebook and the state discussed in Doe v. Cuomo--cited by the County--to be materially different from the

relationship between PFML and SCPD.  See Doe v. Cuomo, No. 10-CV-1534, 2013 WL 1213174, at *1-2, 8-9 (N.D.N.Y. Feb. 25, 2013) ("Cuomo").

C.  The Public Function Test

"Under the public function test, [s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity."  Grogan, 768 F.3d at 264-65 (internal quotation marks and citation omitted) (alteration in original).  The relevant inquiry is whether "the activity historically has been an exclusive prerogative of the sovereign." Id. at 265 (internal quotation marks and citation omitted).

The Court finds that PFML is also a state actor under the public function test.  Previously, this Court held that "the monitoring of registered sex offenders is an inherently public function."  Jones, 164 F. Supp. 3d at 397.  This is evidenced by the regulatory regime designed to monitor sex offenders that began with SORA, which was enacted in 1996 to monitor sex offenders through registration and notification requirements and to formulate a system of classifying offenders.  See Wallace v. New York, 40 F. Supp. 3d 278, 288-89 (E.D.N.Y. 2014).  PFML argues that because the address verification program did not exist prior to the Contract with PFML, the verifications were not an exclusive function of the state.  However, there is evidence that prior to

the Contract with PFML, SCPD detectives performed address verifications of registered sex offenders. (County 56.1 Stmt. ¶¶ 25, 39; Mr. Jones Dep. 101:20-103:19; see also supra note 9.) Additionally, while it is not dispositive, after the police unions "raised issues with respect to some of the duties that may be performed by PFML," the County and the police unions entered into a Memorandum of Understanding (the "Memorandum of Understanding") clarifying the duties of RVRs. (Mem. of Understanding, Harrist Decl., Ex. 54, Docket Entry 129-54.) Detective Lieutenant Hernandez testified that he understood that "sex offender management" was previously "the function of the police department" and "solely the function of the detectives in the [SCPD]," and that those concerns probably led to the execution of the Memorandum of Understanding between the County and the police unions. (See Pl.'s 56.1 Counterstmt. ¶ 9; Hernandez Dep. 88:18-89:3.)

Because the Court concludes that PFML is a state actor, it will proceed to consider Defendants' remaining arguments.

III. <u>Unreasonable Search or Seizure</u>

The County and PFML argue that because Plaintiff voluntarily cooperated with the RVRs, he was not seized within the meaning of the Fourth Amendment. (PFML Br. at 13-18; County Br. at 15-20.) PFML maintains that Plaintiff was not compelled to cooperate with the RVRs. (PFML Br. at 13.) It reasons that the address verifications were "brief, non-threatening interactions"

that did not constitute a seizure as a matter of law. (PFML Br. at 15.) Additionally, PFML raises an argument considered by this Court in it prior Order--that the interaction between Plaintiff and the RVRs is analogous to a "knock and talk," which is not a violation of the Fourth Amendment. (PFML Br. at 15-16.) PFML also argues that the RVRs are akin to census takers. (PFML Br. at 17.) According to PFML, "[P]laintiff's own actions indicate that he was unsure whether compliance was mandatory," and further, an objective person would conclude that compliance with the RVRs was not required. (PFML Br. at 18-19.) The County contends that because "the verifications took less than five (5) minutes," "the PFML representatives never threatened him, intimated him, or asked to enter his home," and Plaintiff was not told that he had to comply with the address verifications, a reasonable person would understand that he was free to terminate the encounter and that, therefore, Plaintiff's cooperation with the RVRs was voluntary. (County Br. at 18.)

Plaintiff relies on the Court's prior Order and argues that Defendants are not entitled to summary judgment because he has "substantiated the allegations relied upon by the Court in its earlier ruling and adduced additional evidence demonstrating the compelled nature of the investigations." (Pl.'s Opp. Br. at 14.) Plaintiff points to the SCPD Letter, the phone call that his wife had with SCPD prior to the first address verification, and the

fact that the RVRs waited fifteen minutes until he was out of the shower to speak with him to support his argument that a reasonable person in his position would not feel free to terminate the interaction. (Pl.'s Opp. Br. at 15-17.) Further, Plaintiff maintains that PFML's procedures for address verifications, including that the RVRs use "verbal judo" to encourage offenders to comply and that they sometimes carry concealed firearms, are "inherently threatening." (Pl.'s Opp. Br. at 17.) Finally, Plaintiff contends that based on all of the circumstances surrounding the address verifications, a jury could find that a reasonable person would feel compelled to cooperate with the RVRs. (Pl.'s Opp. Br. at 18-19.)

PFML contends that if the Court were to find that Plaintiff was seized, Plaintiff's Fourth Amendment claim would still fail because any seizure was reasonable. (PFML Br. at 21-25.) PFML avers that the Court should find that the seizure was reasonable because "[t]he burden on the offenders is minimal, while the important task of ensuring an accurate registry is accomplished." (PFML Br. at 22.) PFML maintains that "the address verification program in question is far less onerous than those regulations that have been repeatedly upheld," including SORA, which required Plaintiff to report to his local police precinct every three years to update his photograph. (PFML Br. at 23-25.) The County emphasizes that the Second Circuit, in Doe v. Cuomo,

755 F.3d 105, 112 (2d Cir. 2014), found certain provisions of SORA to be constitutional, despite the intrusions on the privacy of the sex offender.  (County Br. at 19-20.)

Plaintiff argues that the seizure was not reasonable because the balancing test advocated by the County and PFML (a component of the special needs test) only applies when the immediate objective of the program is a purpose other than to generate evidence for law enforcement.  (Pl.'s Opp. Br. at 22-23.) Plaintiff maintains that there is "substantial evidence that the immediate purpose of the verification program is to generate evidence that registrants are not in compliance with their SORA obligations."  (Pl.'s Opp. Br. at 23.)  Additionally, Plaintiff contends that the reasoning in Doe v. Cuomo, which involved SORA's registration provisions, does not extend to searches at offenders' homes.  (Pl.'s Opp. Br. at 23.)

The Fourth Amendment protects an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. However, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred," which implicates a citizen's Fourth Amendment rights.  Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968).  To determine whether the Fourth Amendment has been violated, the Court

"must engage in a two-part analysis: (1) considering all of the circumstances of the case, was there a seizure within the meaning of the Fourth Amendment; and (2) if there was a seizure, was such seizure reasonable." Jie Yin v. NFTA, 188 F. Supp. 3d 259, 270 (W.D.N.Y. 2016) (internal quotation marks and citation omitted).

A. Whether Plaintiff was Seized

A seizure takes place when a reasonable person would not "feel free to decline [a police] officers' requests or otherwise terminate the encounter.'" Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991); see also United States v. Serrano, 695 F. App'x 20, 22 (2d Cir. 2017). In other words, "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439, 111 S. Ct. at 2389, 115 L. Ed. 2d 389; see also United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) ("Essentially, this inquiry is an objective assessment of the overall coercive effect of the police conduct.").

The following factors suggest a seizure has occurred: "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory;

prolonged retention of a person's personal effects . . . ; and a request by the officer to accompany him to the police station or a police room." Lee, 916 F.2d at 819; see also United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980). For example, in United States v. Drayton, the Supreme Court found that police officers who boarded a Greyhound bus and asked passengers questions about their travel plans and luggage did not "seize" the passengers because "there was nothing coercive or confrontational about the encounter." 536 U.S. 194, 203-04, 122 S. Ct. 2105, 2112, 153 L. Ed. 2d 242 (2002) (internal quotation marks and citation omitted). However, the Supreme Court concluded that while police officers may ask questions and request identification "even when [they] have no basis for suspecting a particular individual," officers may "not induce cooperation by coercive means." Id. at 201, 122 S. Ct. at 2110, 153 L. Ed. 2d 242.

Considering all of the circumstances in this case, the Court finds that there is a genuine issue of fact as to whether a reasonable person in Plaintiff's position would have felt free to terminate the address verifications. First, as the Court noted in its prior Order, the encounter took place within the curtilage, "an area afforded heightened Fourth Amendment protection." Jones, 164 F. Supp. 3d at 398. Second, before the first verification, Plaintiff received the SCPD Letter from Detective Lieutenant

Hernandez, which (1) displayed SCPD letterhead, (2) explained that SCPD had entered into a contract with PFML "for the purpose of conducting verifications of registered sex offenders' residential and employment addresses," and (3) stated that "[r]egistered sex offenders are required to provide this information under the New York State Sex Offender Registration Act, also known as Megan's Law." (SCPD Letter (emphasis supplied).) Although the SCPD Letter also stated that "[y]ou will be asked to provide them with personal identification" and "you may be requested to provide your employment information," (SCPD Letter), this language, in combination with the language indicating that offenders are required to provide such information, renders the Letter "ambiguous as to whether compliance was mandatory." Jones, 164 F. Supp. 3d at 398. As this Court pointed out, "[c]itizens do not often receive letters from the police announcing home visits by third-party groups." Id. Third, after receiving the SCPD Letter, Plaintiff's wife testified that she called SCPD and asked if her husband "had to abide by this [L]etter" and was told that "[her husband] should answer the questions, [and] not to be rude to the people from Megan's Law."[18] (PFML 56.1 Stmt. ¶ 128; Pl.'s 56.1 Counterstmt. ¶ 85; Mrs. Jones Dep. 16:10-17:5.) Fourth, there is

---

[18] While Mr. Jones was not a party to the conversation, Mrs. Jones relayed the conversation to her husband. (Pl.'s 56.1 Counterstmt. ¶ 91; Mr. Jones Dep. 24:25-26:3.)

a dispute regarding how long the RVRs waited to speak with Plaintiff during the first address verification, which could impact whether a reasonable individual would believe that compliance was required. Plaintiff testified that when they came to his home on August 6, 2013, the RVRS waited for approximately fifteen minutes--until he got out of the shower--to speak with him. (Mr. Jones Dep. 38:19-21.) However, one of the RVRs verifying Plaintiff's address that day testified that he did not believe he ever waited as long as fifteen minutes to speak with an offender because the offender was in the shower, but acknowledged that he did not have any recollection of the August 6, 2013 verification. (PFML 56.1 Stmt. ¶¶ 107-08; Pl.'s PFML Resp. ¶¶ 107-08; Carboine Dep. 59:25-60:10, 62:13-63:10.)

Defendants emphasize that several characteristics of the encounters--including that the visits were brief and that the RVRs were polite and never threatened Plaintiff--demonstrate that Plaintiff's cooperation was voluntary and that a reasonable person would not assume otherwise. (See, e.g., PFML Br. at 13-14.) Additionally, they point out that Plaintiff never asked the RVRs to leave or asked them if he was required to comply with their requests. (See, e.g., PFML Br. at 14.) While these facts may be relevant to whether Plaintiff was seized, Defendants completely ignore the fact that Plaintiff received the SCPD Letter, which could be interpreted as advising offenders that compliance was

mandatory, and that Mrs. Jones had a conversation with a police officer during which she was told that her husband "should" comply. The law is clear that whether a seizure occurred must be determined "in view of all of the circumstances surrounding the incident." Mendenhall, 446 U.S. at 554, 100 S. Ct. at 1877, 64 L. Ed. 2d 497. When all of the relevant circumstances are considered, the Court cannot resolve as a matter of law whether a reasonable individual would believe he could terminate the address verifications. See McCaffrey v. Cty. of Nassau, No. 11-CV-1668, 2013 WL 2322879, at *10 (E.D.N.Y. May 25, 2013) (denying summary judgment on Fourth Amendment claim due to a "significant issue of fact as to whether a reasonable person would have believed that he was not free to leave").

The cases cited by Defendants do not change the result. See, e.g., Mendenhall, 446 U.S. at 555, 100 S. Ct. at 1877-78, 64 L. Ed. 2d 497 (holding that individual was not seized when she was approached by federal agents in airport and asked for her identification); Neighbour v. Covert, 68 F.3d 1508, 1511 (2d Cir. 1995) (holding that plaintiff was not seized when she was approached by two officers at work, questioned, and asked by the officers to come to the police station); Caulfield v. Bd. of Educ. of City of N.Y., 583 F.2d 605, 611-12 (2d Cir. 1978) (finding that questionnaires collecting biographical information from school personnel did not constitute a search or seizure); Ligon v. City

of N.Y., 925 F. Supp. 2d 478, 506-07 (S.D.N.Y. 2013) (finding that encounters between one plaintiff and the New York Police Department were not seizures in class action challenging New York Police Department's stop and frisk practices).  Specifically, Mendenhall, Neighbour, and Ligon did not involve encounters at the individual's home and were not preceded by letters from law enforcement or conversations during which law enforcement told the individual he should comply.

B.  Whether the Seizure was Reasonable

Finally, the Court considers whether, assuming Plaintiff was seized, the seizure was reasonable.  See United States v. Lifshitz, 369 F.3d 173, 178 (2d Cir. 2004) ("The touchstone in evaluating the permissibility of any search is reasonableness.") (internal quotation marks and citation omitted).  Generally, a seizure must be supported by a warrant and probable cause, or when a warrant is not required, by "'some quantum of individual suspicion.'"  Lynch v. City of N.Y., 737 F.3d 150, 157 (2d Cir. 2013) ("Lynch II") (quoting Maryland v. King, 569 U.S. 435, 447, 133 S. Ct. 1958, 1969, 186 L. Ed. 2d 1 (2013)).  However, probable cause or some degree of suspicion is not "'an indispensable component of reasonableness is every circumstance.'"  Id. (quoting Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989)); see also City of Indianapolis v. Edmond, 531 U.S. 32, 37, 121 S. Ct. 447, 451, 148 L. Ed. 2d 333

(2000). Courts have found that certain suspicionless seizures are reasonable "where the program was designed to serve special needs, beyond the normal need for law enforcement." Edmond, 531 U.S. at 37, 121 S. Ct. at 451, 148 L. Ed. 2d 333 (internal quotation marks omitted); see also Nicholas v. Goord, 430 F.3d 652, 661 (2d Cir. 2005) (discussing the contexts in which the special needs exception has been applied). While the Supreme Court has applied the special needs exception--articulated for the first time by Justice Blackmun in New Jersey v. T.L.O., 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985)--to different circumstances, in each case, the Supreme Court "found that the suspicionless-search regime at issue served some special need distinct from normal law-enforcement needs." Nicholas, 430 F.3d at 661. On the other hand, when the program is designed to "uncover evidence of ordinary criminal wrongdoing," there is no special need beyond the need for law enforcement and the special needs exception does not apply. See Edmond, 531 U.S. at 41-42, 121 S. Ct. at 454, 148 L. Ed. 2d 333 (holding that checkpoint program designed to confiscate narcotics violated the Fourth Amendment). The Second Circuit has explained that "what makes the government's need . . . 'special,' despite its relationship to law enforcement, is . . . its incompatibility with the normal requirements of a warrant and probable cause, and especially, the corollary that the nature of the search involved greatly attenuates the risks and harms that

the warrant and probable cause requirements are intended to protect against." United States v. Amerson, 483 F.3d 73, 82 (2d Cir. 2007).

If the program's primary purpose is a special need beyond traditional law enforcement, a court engages in a "'context-specific' assessment of the special needs as weighed against the privacy interest affected." Lynch II, 737 F.3d at 163-64 (quoting Chandler v. Miller, 520 U.S. 305, 314, 117 S. Ct. 1295, 1301, 137 L. Ed. 2d 513 (1997)). Specifically, a balancing test of three factors is required: "'(1) the nature of the privacy interest involved; (2) the character and degree of the government intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.'" Amerson, 483 F.3d at 83-84 (quoting Cassidy v. Chertoff, 471 F.3d 67, 75 (2d Cir. 2006)).

1.  The Primary Purpose of the Address Verification
    Program

To determine whether a program serves special needs apart from normal law enforcement needs, "a court must conduct a 'close review of the scheme at issue' in light of 'all the available evidence' to determine its 'primary purpose.'" Lynch II, 737 F.3d at 157 (quoting Ferguson v. City of Charleston, 532 U.S. 67, 81, 121 S. Ct. 1281, 1290, 149 L. Ed. 2d 205 (2001)). The inquiry should focus on the "immediate objective of the

challenged . . . program, not its ultimate goal." Id. at 158 (internal quotation marks and citation omitted); see also Nicholas, 430 F.3d at 667 ("[W]e first ask what the statute's primary purpose is, mindful that it is the statute's immediate rather than ultimate objective that is relevant."). The Second Circuit has explained that generally, a law enforcement purpose is one involving "ordinary evidence gathering associated with crime investigation." Nicholas, 430 F.3d at 663. If one of the purposes of a particular program is a normal law enforcement need, such as crime control, the special needs doctrine may still apply if that need is not the primary purpose of the program. See Lynch v. City of N.Y., 589 F.3d 94, 102 (2d Cir. 2009) ("Lynch I") ("[T]he mere fact that crime control is one purpose--but not the primary purpose--of a program of searches does not bar the application of the special needs doctrine.") (emphasis in original).

For example, in Lynch II, the Second Circuit examined whether the special needs test applied to a policy of the New York City Police Department ("NYPD") requiring that a breathalyzer be administered to any officer who discharges a firearm within the city resulting in injury or death, which plaintiffs argued violated their Fourth Amendment rights. Lynch II, 737 F.3d at 152-53. The court concluded that the evidence demonstrated that the primary purpose of the initiative was "personnel management of, and the maintenance of public confidence in, the NYPD." Id. at 159.

Additionally, it reasoned that "the possibility that . . . test results might ultimately be used as evidence in a criminal prosecution does not take the case out of the special needs doctrine." Id. at 162. The Second Circuit also considered whether the special needs proffered by the NYPD were "incompatible" with the traditional requirements of a warrant and probable cause such that it was appropriate to dispense with those requirements. Id. at 162-63. The court held that because the mandatory breathalyzer tests were limited to specific, narrow circumstances and did not involve any exercise of discretion, the traditional requirements of a warrant and probable cause were not necessary. Id. For these reasons, the Second Circuit found that the breathalyzer policy primarily served a non-law enforcement purpose and satisfied the first criterion for application of the special needs test. Id. at 163.

Additionally, in Nicholas, the Second Circuit considered whether a New York statute requiring that certain convicted felons provide DNA samples served a special need beyond criminal investigation. Nicholas, 430 F.3d at 655, 668-69. Initially, the court acknowledged that while "[t]here can be little doubt that New York's statute serves a purpose related to law enforcement[,] . . . we do not think that fact automatically condemns the New

York statute."[19]  Id. at 668.  Relying on Illinois v. Lidster, 540

U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004), the Second

Circuit explained that the distinction between a program that

employs "information-seeking searches or seizures, which respond

to special law enforcement concerns," and searches "aimed at

detect[ing] evidence of ordinary criminal wrongdoing" is critical.

Nicholas, 430 F.3d at 668 (internal quotation marks and citations

omitted).  It reasoned that New York's DNA statute was akin to an

"information-seeking" search or seizure because "at the time of

collection, the samples . . . provide no evidence in and of

themselves of criminal wrongdoing and are not sought for

investigation of a specific crime."  Id. at 669 (internal quotation

marks and citation omitted).  As a result, the court concluded

that the statute served a special need distinct from normal law

enforcement needs and proceeded to apply the balancing test

outlined above.  Id.  Previously, the Second Circuit upheld a

similar statute which required convicted sex offenders to provide

a blood sample for a DNA database on similar grounds.  See Roe v.

Marcotte, 193 F.3d 72, 79-80 (2d Cir. 1999).

        Accordingly, the Court examines the primary purpose of

_____

[19] The court agreed that the purpose was "to create a DNA
database to assist in solving crimes should the investigation of
such crimes permit resort to DNA testing of evidence."
Nicholas, 430 F.3d at 668 (internal quotation marks and citation
omitted).

the address verification program and begins by looking to the CPA. The purpose of the CPA--of which the address verification program was only one part--was "to make Suffolk County families and communities safer through the implementation of a series of law enforcement initiatives affecting all sex offenders across the County." (Contract at 4, Article I.) However, the appropriate inquiry is narrower; rather than examining the CPA as a whole, the Court must focus on the purpose of the address verification program specifically.

The terms of the Contract indicate that the purpose of the program was to verify the information provided by offenders pursuant to SORA. The Contract states that "the Community Protection Act authorizes the Commissioner of the Department and/or his designee <u>to execute a contract with the Contractor [PFML] to carry out a program for the purposes of</u>:

> (i) <u>verification of residency reporting of all registered sex offenders who are not homeless and who are not required to report pursuant to SORA</u>;
> (ii) proactive monitoring of registered sex offenders to ensure accurate reporting of registered sex offender addresses, which includes monitoring of social media for address verification and to ensure registered sex offenders are not using social media in violation of applicable law;
> (iii) development of a system for community reporting of SORA violations;
> (iv) development of community email alert and website enhancements to provide notification of registered sex

```
                    offenders;
          (v)    provision of crime victim services; and
          (vi)   provision of community outreach and
                 prevention education.
```

(Contract at 4 (emphasis supplied).)  PFML's 2013-14 Annual Report

to the County states that "a more updated and accurate sex offender

registry" would be accomplished "through in-person sex offender

address verifications and collaboration with law enforcement

agencies through the provision of potential felony out-of-

compliance investigative leads."  (2013-14 Annual Rep. at ECF

p. 3.)

    Similarly, according to PFML personnel, the purpose of

the program was to ensure that the registry was accurate.  Ahearn

testified that the address verification provision of the CPA was

included because members of the community were concerned that the

registry was not accurate and made complaints to that effect.

(Ahearn Dep. 20:14-22:11; PFML 56.1 Stmt. ¶ 6.)  Rau, PFML's grant

administrator, testified that "the purpose of the registration

verification program was to ensure that information provided on

the registry was accurate so that people could act upon accurate

information."  (County 56.1 Stmt. ¶ 60; Rau Dep. 19:16-20:5; see

also Ahearn Dep. 78:2-5 (Q: "So the goal of the home address

verification program from PFML['s] perspective was to get an up-

to-date registry? A: To ensure the registry is up to date.").)

Additionally, Ahearn testified that "[t]he objective is not to

generate leads.  The objective is to have an up-to-date registry

to make sure that when parents or victim[s] of sexual assault [are]

checking the registry and knowing where that registered offender

is and knowing that the information [is] up to date and accurate."[20]

(Ahearn Dep. 117:13-18.)  She explained that any inconsistency in

the registrant's information, including an incorrect zip code, for

example, would be transmitted to SCPD as a lead and "the idea is

[that] [SCPD] can reach out to the registrant and correct the

information by providing the registrant the form to correct it,"

or SCPD could reach out to the Division directly to make

corrections.  (Ahearn Dep. 118:5-119:4.)

As discussed, part of the program involved transmission

of leads to SCPD.  After SCPD received the form documenting the

tip from PFML, SCPD opened an investigation and typically, a

detective would visit the offender's home.  (Hernandez Dep. 76:5-

78:20.)  Detective Lieutenant Hernandez believed that the forms

---

[20] There is some evidence in the record connecting an accurate
registry with reduced recidivism.  (See, e.g., Ahearn Dep.
22:11-16; Jan. 31, 2012 Minutes at ECF p. 11-12 (SCPD Chief
James Burke explaining that the proposed sex offender management
plan would "strengthen[ ] our address verification efforts" and
stating that "[i]t's been proven that [the] sex offender
registry reduces sex offender recidivism . . . [but] the
registry is only good if it's accurate"); Feb. 27, 2015 Press
Release ("Since the implementation of the Community Protection
Act, there are no reported cases with the Suffolk County Police
Department of Suffolk County registered sex offenders
reoffending in the County, a 100% reduction in sex offender
recidivism.").)

used by PFML to transmit failure-to-cooperate leads to SCPD were not used as evidence in any subsequent investigation related to the offender's failure to register and testified that further investigation would be necessary to develop probable cause and make an arrest. (Hernandez Dep. 96:13-97:9; County 56.1 Stmt. ¶ 98.) PFML was not involved in any arrests, and SCPD retained sole discretion regarding how to use the leads provided by PFML. (PFML 56.1 Stmt. ¶¶ 32, 34.)

Plaintiff argues that "there is substantial evidence that the immediate purpose of the verification program is to generate evidence that registrants are not in compliance with their SORA obligations." (Pl.'s Opp. Br. at 23.) He points to several facts to support this argument, including that: (1) if the offender's address was successfully verified, PFML provides information gathered during address verifications to SCPD on "blue sheets," and the information was entered into a SCPD database in the event it becomes relevant to a future investigation, (Pl.'s 56.1 Counterstmt. ¶¶ 23-25); (2) if the address verification revealed a violation of the law or the offender refused to cooperate, PFML transmitted the information and the potential violation to SCPD, which led to the opening of an investigation, (Pl.'s 56.1 Counterstmt. ¶¶ 26-32); (3) the County has arrested nineteen offenders for failure to register as a result of address verifications as of April 2016, (Pl.'s 56.1 Counterstmt. ¶ 53);

and (4) the County has issued press releases publicizing the number of arrests made pursuant to the CPA, including forty-four arrests as of February 2015, (Pl.'s 56.1 Counterstmt. ¶¶ 60-61). These facts do show that on certain occasions, the tips provided by PFML led to the opening of an investigation which resulted in an arrest. However, the record also shows that the forms documenting address verifications were not used as evidence in those investigations and that SCPD would need to obtain additional information to support a finding of probable cause to arrest. Thus, in the Court's view, these facts do not support Plaintiff's contention that the primary purpose of the address verification program was generating evidence to charge non-compliant offenders.[21]

In view of the all of the evidence, the Court concludes that the address verification program served a special need because the primary purpose of the program was to verify the addresses of registered sex offenders in order to improve the accuracy of the sex offender registry. To be sure, the program also served to bring offenders into compliance with SORA and to ensure that non-compliant offenders would face consequences, including criminal investigation and possible arrest, which is undoubtedly a law enforcement need. But the fact that the address verification program "serves a purpose related to law enforcement" does not

---

[21] The fact that one RVR testified against an offender does not change this result. (See McCormack Dep. 22:19-25:19.)

"automatically condemn[ ]" it.  Nicholas, 430 F.3d at 668.  The information obtained by PFML does not itself constitute evidence of wrongdoing and is not sought in the course of investigating a crime.  See id.  Moreover, the Second Circuit has been clear that the immediate objective of the program--not the program's ultimate goal--is the primary purpose relevant to the application of the special needs test.  See Lynch II, 737 F.3d at 159 ("[E]ven if . . . test results might ultimately provide evidence relevant to a criminal prosecution--something that has never occurred to date-- the record does not here admit a conclusion that the immediate object of the . . . testing is the procurement of criminal evidence in order to prosecute the police officer in question.") (emphasis omitted).  Finally, because the address verification program applied uniformly to all registered sex offenders in Suffolk County (consistent with their classification as either a Level One, Level Two, or Level Three Offender), the frequency of the visits was dictated by the Contract between PFML and SCPD, and it appears that the same information was sought from every offender, the program was administered with little to no discretion, which weighs in favor of dispensing with the traditional warrant and probable cause requirements.  See Lifshitz, 369 F.3d at 187 (noting that in cases involving drug testing and DNA collection, "the lack of discretionary application of the procedure minimized the concerns traditionally underlying the requirements of probable cause and

reasonable suspicion"); <u>Lynch II</u>, 737 F.3d at 163 ("'Indeed, in light of the standardized nature' of . . . testing, and the 'minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate.'") (quoting <u>Maryland</u>, 569 U.S. at 447, 133 S. Ct. at 1970, 186 L. Ed. 2d 1); <u>Amerson</u>, 483 F.3d at 82 ("This lack of discretion removes a significant reason for warrants--to provide a check on the arbitrary use of government power.").

Accordingly, the Court will proceed to balance this special need against Plaintiff's privacy interest utilizing the three factors outlined above.  See <u>Amerson</u>, 483 F.3d at 83-84 (quoting <u>Cassidy</u>, 471 F.3d at 75) ("[T]his balancing test is to be based on an examination of three factors: '(1) the nature of the privacy interest involved; (2) the character and degree of the government intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.'").

2. <u>Plaintiff's Privacy Interest and the Government Intrusion</u>

As the Court previously acknowledged, Plaintiff's encounters with the RVRs occurred within the curtilage, an area implicating heightened privacy interests.  See <u>Jardines</u>, 569 U.S. at 7, 133 S. Ct. at 1415, 185 L. Ed. 2d 495 (quoting <u>California v. Ciraolo</u>, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812, 90 L. Ed. 2d

210 (1986)) ("Th[e] area around the home is 'intimately linked to the home, both physically and psychologically' and is where 'privacy expectations are most heightened.'"). However, this fact does not end the analysis. See United States v. Titemore, 437 F.3d 251, 258 (2d Cir. 2006) (quoting United States v. Arboleda, 633 F.2d 985, 992 (2d Cir. 1980) ("'Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis.'")). Notably, Plaintiff's interactions with the RVRs occurred on the steps, the walkway leading to the sidewalk, the sidewalk, or the street where Plaintiff's truck was parked[22]--areas outside the home where his expectation of privacy is diminished. See Titemore, 437 F.3d at 259 (observing that "while the sliding-glass door and porch are connected to the house and, in this respect, would tend to support a finding that they are within the curtilage of the home, they also constitute part of a principal entranceway, which has been associated with a diminished expectation of privacy" in case involving a state trooper entering defendant's property after receiving vandalism

---

[22] (See Mr. Jones Dep. 40:17-24 (testifying that during the first address verification, the RVRs were "on the sidewalk" in front of his house when he came to the door), 60:9-16 (testifying that during the second address verification, one RVR was at the bottom of the steps, one was fifteen feet away, and a third was standing near the back of a car); Mrs. Jones Dep. 22:16-25 (testifying that during the first address verification, the RVRs were standing in front of the porch at the bottom of the steps).)

complaint); <u>Palmieri v. Lynch</u>, 392 F.3d 73, 81-82 (2d Cir. 2004)

(quoting <u>United States v. Reyes</u>, 283 F.3d 446, 465 (2d Cir. 2002))

("'[T]he route which any visitor to a residence would use is not

private in the Fourth Amendment sense.'").  Thus, while Plaintiff

had a substantial privacy interest, the interest was not without

its limits.  Moreover, Plaintiff clearly had a diminished privacy

interest in his personal information, such as his address, since

that information was already on the registry and available to the

public.

        Next, the Court considers the character and degree of

the government intrusion.  As discussed, the fact that Plaintiff

was visited at his home is significant.  However, several other

facts demonstrate that the degree of the intrusion was limited,

including that the address verifications only lasted several

minutes,[23] the RVRs never sought to enter Plaintiff's home or

vehicle, and the RVRs were dressed in plain clothes and used an

unmarked car.  (PFML 56.1 Stmt. ¶¶ 124, 136, 153, 157; Pl.'s PFML

Resp. ¶ 124; County 56.1 Stmt. ¶¶ 27, 30, 31; Pl.'s County Resp.

¶¶ 27, 30; Mrs. Jones Dep. 28:11-16; Mr. Jones Dep. 40:25-41:6,

61:2-62:11; Contract at 8, III(A)(2).)

        3.  <u>The Government's Need</u>

---

[23] While Plaintiff maintains that the RVRs waited outside for
approximately fifteen minutes while he showered before the first
address verification--assuming he was seized--the Court does not
consider him to have been seized during that time.

The government has a strong interest in monitoring registered sex offenders and ensuring the safety of its residents. "Studies have shown that sex crimes are widespread . . . and that their impact on both the victim and ociety as a whole is devastating." Doe v. Pataki, 120 F.3d 1263, 1266 (2d Cir. 1997) ("Doe I") (citations omitted). It is undisputed that the actions of sex offenders inflict serious harm to society. Id. Further, the government has a strong interest in reducing recidivism among sex offenders and protecting future potential victims.[24] See id. (acknowledging that while the findings of studies are inconsistent, "[s]ome studies have . . . demonstrated that, as a group, convicted sex offenders are much more likely than other offenders to commit additional sex crimes"); Lifshitz, 369 F.3d at 187 (observing that "there is a high rate of recidivism among sex offenders"); see also Doe v. Cuomo, 755 F.3d 105, 115 (2d Cir. 2014) ("Doe II") (holding that SORA registration requirements did not violate Fourth Amendment because the registration requirements serve special needs and "the degree of intrusion on convicted sex offenders is reasonable in relation to the interests advanced by SORA").

In this case, the County and PFML sought to advance these

---

[24] Here, there is evidence that the address verification program was motivated in part by a desire to reduce recidivism. See supra note 20.

interests by verifying the accuracy of the sex offender registry. The accuracy of the registry is critical to its effectiveness; if an offender reports an incorrect address or fails to report any address, the registry cannot serve the purposes for which it was intended. Additionally, while verifying the information required some intrusion on the privacy of the offenders, the County employed the least intrusive mechanism to accomplish the task--for Level One Offenders such as Plaintiff, a brief, yearly verification by PFML staff.

4. Balancing

Balancing the relevant factors--Plaintiff's significant privacy interest, the limited nature of the intrusion, and the government's strong interest in monitoring sex offenders--the Court finds that, if Plaintiff was seized, the seizure was reasonable and did not violate the Fourth Amendment. While Plaintiff's privacy interest weighs in his favor, the nature of the intrusion and the County's compelling interests tip the balance in Defendants' favor. Thus, Plaintiff's Fourth Amendment claim is DISMISSED. Further, because Plaintiff has not established a constitutional violation, his claim for municipal liability against the County under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S Ct. 2018, 56 L. Ed. 2d 611

(1978), is also DISMISSED.[25]

## C. Remaining State Law Claims

In light of the dismissal of the federal claims, only Plaintiff's state law claims remain. (See Compl. ¶¶ 67-69.) "[A]bsent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or [on] summary judgment grounds, courts should abstain from exercising pendent jurisdiction." Dole v. Huntington Union Free Sch. Dist., 14-CV-1283, 2016 WL 4703658, at *7 (E.D.N.Y. Sept. 8, 2016), aff'd, 699 F. App'x 85 (2d Cir. 2017) (internal quotation marks and citation omitted); Krumholz v. Vill. of Northport, 873 F. Supp. 2d 481, 492 (E.D.N.Y. 2012). The Court determines that retaining jurisdiction over the state law claims is unwarranted. Thus, the Court declines to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3), and the state law claims are DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the foregoing reasons, the County's motion for summary judgment (Docket Entry 119) and PFML's motion for summary judgment (Docket Entry 120) are GRANTED. Plaintiff's Fourth Amendment and Monell claims are DISMISSED WITH PREJUDICE. The

---

[25] In light of the Court's determination, it declines to address Defendants' arguments related to damages and PFML's argument that Plaintiff's claims should be dismissed as moot. (See County Br. at 20; PFML Br. at 12.)

Court declines to exercise supplemental jurisdiction over the remaining state law claims, and those claims are DISMISSED WITHOUT PREJUDICE.  The Clerk of the Court is directed to enter judgment accordingly and mark the case CLOSED.


                                SO ORDERED.


                                /s/ JOANNA SEYBERT_____
                                Joanna Seybert, U.S.D.J.

Dated:     May __1__, 2018
           Central Islip, New York